IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

BACKPAGE.COM, LLC,  )
  )
       Plaintiff,  )
  )
v.  )    Case No. _____
  )
ROBERT E. COOPER, JR., Attorney General of  )
the State of Tennessee; and TONY CLARK;  )
BARRY STAUBUS; C. BERKELEY BELL;  )
JAMES DUNN; MIKE FLYNN; RANDALL  )
NICHOLS; DAVE CLARK; WILLIAM PAUL  )
PHILLIPS; RUSSELL JOHNSON; STEVEN  )
BEBB; WILLIAM H. COX, III; J. MICHAEL  )
TAYLOR; RANDY YORK; MICKEY LAYNE;  )
TOM P. THOMPSON; WILLIAM WHITESELL;  )
CHUCK CRAWFORD; L. RAY WHITLEY;  )
JOHN W. CARNEY; VICTOR S. JOHNSON,  )
III; KIM HELPER; MIKE BOTTOMS; DAN M.  )
ALSOBROOKS; HANSEL MCCADAMS;  )
MIKE DUNAVANT; JAMES G. WOODALL;  )
THOMAS A. THOMAS; GARRY BROWN;  )
PHILLIP BIVENS; AMY P. WEIRICH; and  )
LISA ZAVAGIANNIS; Tennessee District  )
Attorneys for the 1st through 31st Judicial  )
Districts, respectively,  )
  )
       Defendants, in their official  )
       capacities.  )
  )

**PLAINTIFF BACKPAGE.COM, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION TO PREVENT ENFORCEMENT
OF TENNESSEE PUBLIC CHAPTER 1075**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND ............................................................................................................ 3

    A.   State AGs' Crusade Against Adult-Oriented Internet Advertising. ................................. 3

    B.   Backpage.com's Efforts to Police and Prevent Misuse of Its Website. ........................... 4

    C.   Washington Passes the First State Law Criminalizing Ads Ostensibly Concerning "Commercial Sexual Abuse of Minors." ....................................................... 5

    D.   The Tennessee General Assembly Passes Public Chapter 1075, Which Is Based on the First Draft of the Washington State Bill. ...................................... 5

    E.   A Federal Court Enjoined Washington State's Law. .......................................................... 7

    F.   The Act Will Affect Thousands of Websites and Online Providers. ................................ 7

III.   ARGUMENT .................................................................................................................. 8

    A.   Standards for TRO or Preliminary Injunction. ................................................................. 8

    B.   Backpage.com Has A Strong Likelihood of Success on the Merits. ................................ 9

        1.   Section 230 of the CDA Preempts Public Chapter 1075. ............................................ 9

        2.   Public Chapter 1075 Violates the First and Fourteenth Amendments Because It Eliminates Scienter. ............................................................................. 13

        3.   Public Chapter 1075 Violates the First Amendment. ................................................. 15

        4.   SB 6251 Violates the Commerce Clause. .................................................................. 22

    C.   Backpage.com, Other Online Services, and the Public Will Suffer Irreparable Harm If Public Chapter 1075 Is Not Enjoined. ................................................. 24

    D.   Granting Injunctive Relief Is In the Public Interest. ....................................................... 24

    E.   The Balance of the Equities Favors Granting Injunctive Relief. .................................... 24

IV.   CONCLUSION ............................................................................................................. 25

Case 3:12-cv-00654   Document 4   Filed 06/27/12   Page 2 of 33 PageID #: 29

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ACLU v. Johnson,*
194 F.3d 1149 (10th Cir. 1999) .........................................................................23

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003).............................................................................22, 23

*Am. Civil Liberties Union v. Ashcroft,*
322 F.3d 240 (3d Cir. 2003)...............................................................................21

*Am. Library Ass'n v. Pataki,*
969 F. Supp. 160 (S.D.N.Y. 1997) .....................................................................23

*American-Arab Anti-Discrimination Comm. v. City of Dearborn,*
418 F.3d 600 (6th Cir. 2005) .............................................................................14

*Ashcroft v. Am. Civil Liberties Union,*
542 U.S. 656 (2004)......................................................................................15, 20

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002)......................................................................................18, 19

*Ass'n of Cleveland Fire Fighters v. City of Cleveland,*
502 F.3d 545 (6th Cir. 2007) .............................................................................21

*Baca v. Moreno Valley Unified Sch. Dist.,*
936 F. Supp. 719 (C.D. Cal. 1996) ....................................................................25

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ...........................................................................11

*Bartnicki v. Vopper,*
532 U.S. 514 (2001).............................................................................................16

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) .........................................................................9, 11

*Bays v. City of Fairborn,*
668 F.3d 814 (6th Cir. 2012) ...............................................................................8

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.,*
206 F.3d 980 (10th Cir. 2000) .............................................................................9

1

*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998) ........................................................................10

*Brown v. Entm't Merchs. Ass'n*,
   131 S. Ct. 2729 (2011) ..............................................................................16, 17

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ........................................................................10

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n*,
   447 U.S. 557 (1980).........................................................................................20

*Chicago Lawyer's Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) .....................................................................10, 11

*Congregation Lubavitch v. City of Cincinnati*,
   923 F.2d 458 (6th Cir. 1991) ..........................................................................24

*Connection Distrib. Co. v. Reno*,
   154 F.3d 281 (6th Cir. 1998) .......................................................................8, 24

*Ctr. for Democracy & Tech. v. Pappert*,
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ..............................................................23

*Cyberspace Commc'ns Inc. v. Engler*,
   142 F. Supp. 2d 827 (E.D. Mich. 2001)...........................................................23

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,
   274 F.3d 377 (6th Cir. 2001) ..........................................................................18

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) ............................................................................8

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ..........................................................................10

*Doe v. SexSearch.com*,
   551 F.3d 412 (6th Cir. 2008) ..........................................................................10

*Eckert v. Microsoft Corp.*,
   2007 WL 496692 (E.D. Mich. Feb. 13, 2007) .................................................10

*Elrod v. Burns*,
   427 U.S. 347 (1976).....................................................................................8, 24

*Energy Automation Sys., Inc. v. Xcentric Ventures, LLC*,
   2007 WL 1557202 (M.D. Tenn. May 25, 2007)...............................................10

2

*ETW Corp. v. Jireh Publ'g, Inc.*,
　332 F.3d 915 (6th Cir. 2003) ........................................................19

*Hamilton's Bogarts, Inc. v. Michigan*,
　501 F.3d 644 (6th Cir. 2007) ..........................................................8

*Healy v. Beer Inst., Inc.*,
　491 U.S. 324 (1989) .....................................................................22

*Int'l Dairy Foods Ass'n v. Boggs*,
　622 F.3d 628 (6th Cir. 2010) ........................................................22

*Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*,
　2006 WL 1638537 (M.D. Tenn. June 6, 2006)..............................25

*Johnson v. Arden*,
　614 F.3d 785 (8th Cir. 2010) ........................................................10

*M.A. v. Village Voice Media Holdings, LLC*,
　809 F. Supp. 2d 1041 (E.D. Mo. 2011)..........................................11

*Mich. State AFL-CIO v. Miller*,
　103 F.3d 1240 (6th Cir. 1997) ......................................................16

*Miller v. City of Cincinnati*,
　622 F.3d 524 (6th Cir. 2010) ........................................................21

*Mishkin v. New York*,
　383 U.S. 502 (1966).....................................................................14

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
　591 F.3d 250 (4th Cir. 2009) ........................................................10

*New York v. Ferber*,
　458 U.S. 747 (1982).................................................................13, 14

*Norton v. Ashcroft*,
　298 F.3d 547 (6th Cir. 2002) ........................................................16

*Ohio Republican Party v. Brunner*,
　543 F.3d 357 (6th Cir. 2008) ..........................................................8

*Pike v. Bruce Church, Inc.*,
　397 U.S. 137 (1970).....................................................................24

*Procter & Gamble Co. v. Bankers Trust Co.*,
　78 F.3d 219 (6th Cir. 1996) ............................................................8

3

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ................................................................23

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..........................................................................16

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997) ...............................................................18, 20, 21

*S.O.C., Inc. v. Cnty. of Clark*,
    152 F.3d 1136 (9th Cir. 1998) ............................................................20

*Se. Booksellers Ass'n v. McMaster*,
    282 F. Supp. 2d 389 (D.S.C. 2003) ....................................................23

*Smith v. California*,
    361 U.S. 147 (1960) ..........................................................................13

*United Food & Commercial Workers Union Local 1099 v. Sw. Ohio Reg. Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) ............................................................21

*United States v. Gonzales*,
    520 U.S. 1 (1997) ..............................................................................11

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ....................................................................15, 16

*United States v. Williams*,
    553 U.S. 285 (2008) ..........................................................................20

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994) ............................................................................14

*United States v. X-Citement Video, Inc.*,
    982 F.2d 1285 (9th Cir. 1992) ............................................................14

*USACO Coal Co. v. Carbomin Energy, Inc.*,
    689 F.2d 94 (6th Cir. 1982) ................................................................25

*Video Software Dealers Ass'n v. Webster*,
    968 F.2d 684 (8th Cir. 1992) ............................................................14

*Voicenet Comms., Inc. v. Corbett*,
    2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) ....................................11

*Zeran v. Am Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ......................................................10, 12

**OTHER CASES**

*People v. Gourlay*,
  2009 WL 529216 (Mich. Ct. App. Mar. 3, 2009) ...................................................................11

**FEDERAL STATUTES**

18 U.S.C. § 2252 ...................................................................................................................14

18 U.S.C. § 2252A .................................................................................................................20

28 U.S.C. § 1746 ...................................................................................................................17

47 U.S.C. § 230 ...............................................................................................................2, 9, 11

**OTHER STATUTES**

T.C.A. 39-13-512(6) ..............................................................................................................19

T.C.A. §§ 39-13-303, 39-13-211, 39-13-401, and 39-14-301 ..........................................7

T.C.A. § 39-13-309 ..............................................................................................................5, 16

T.C.A. § 39-13-314 ................................................................................................................6

T.C.A. §§ 39-13-506 .............................................................................................................16

T.C.A. § 39-17-901 ...............................................................................................................22

T.C.A. § 39-17-1002 .............................................................................................................22

T.C.A. §§ 40-35-110, 111 .....................................................................................................7

**RULES**

Fed. R. Civ. P. 65 ...............................................................................................................1, 8

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Amend. I .................................................................................................... passim

U.S. Const. Article I, § 8, cl. 3 ............................................................................................22

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Backpage.com, LLC ("Backpage.com") requests immediate injunctive relief to prevent enforcement of a new law, Tennessee Public Chapter 1075, which will otherwise take effect July 1, 2012. Plaintiff respectfully seeks a temporary restraining order, followed by a preliminary injunction after any further briefing and hearing as the Court directs.

## I.     INTRODUCTION

As of July 1, publishers will be at risk of prosecution under a new Tennessee law, Public Chapter 1075 (the "Act"). The Act creates a new felony called "advertising commercial sexual abuse of a minor" but is so broad and vague that it would effectively eliminate vast amounts of user-submitted Internet content. Despite the new crime's name, a person can be prosecuted even though no sexual act occurs and even if an ad or other content does not concern a minor. The Act makes it a crime to sell[] or even "offer[] to sell" an offending ad, even if it is never published, and an ad need only "appear" to be for a "commercial sex act" and "to concern a minor," so that content about adults could result in long prison terms. The Act's terms are so broad that it reaches not only classified ads (online and print), but also all manner of dating sites, personals ads, video chat and more. And the Act purports to regulate the entire Internet, subjecting parties to criminal liability in Tennessee for content having nothing to do with the state.

Public Chapter 1075 is antithetical to constitutional free speech rights and to federal law barring state regulation of the Internet. Under threat of imprisonment, the Act would force online service providers to act as the government's censor of the Internet. It allows only one defense – every party that sells or offers to sell an offending ad must obtain certain government or school identification for the person in the posting. Thus, across the country, online service providers that impose any fees for access or user-submitted content (or that run ads or links to other websites) must review all content and make a judgment whether it could violate Tennessee

1

law and, if so, to require identification. Because this is a practical impossibility, and because the Act's penalties are so severe (3 to 15 years' imprisonment and a minimum $10,000 fine per violation), in all likelihood, online service providers will block vast amounts of speech protected by the First Amendment. If allowed to stand, Public Chapter 1075 would bring much of the practice of hosting third-party content to a grinding halt.

This Court should enjoin enforcement of the Act for at least four reasons:

*First*, the Act violates the Communications Decency Act of 1996 ("CDA"). Designed to foster free speech on the Internet, section 230 prohibits treating an online service provider "as the publisher or speaker of any information provided by another information content provider," and forbids imposing liability under any inconsistent state law. 47 U.S.C. §§ 230(c)(1), (e)(3).

*Second*, the Act lacks scienter, as required by the First and Fourteenth Amendments. It imposes criminal liability without requiring that a defendant know a person described in an ad is in fact a minor and expressly provides that lack of knowledge of age is no defense. The Supreme Court has held that the State may not impose criminal liability on distributors of sexually related expression that may "appear to" involve minors, without proof the defendant knew the persons depicted were in fact minors.

*Third*, the Act contravenes the First Amendment as a content-based restriction on speech that is neither narrowly tailored nor the least speech-restrictive means of addressing the State's purpose. The Act is vastly overbroad; it sweeps within its ambit lawful content far removed from the State's goal of preventing sexual exploitation of minors. It criminalizes any ad (published or not) that "appears to" be for "any sexual act for which something of value is given or received" and "appears to" concern a minor. This reaches not only online and print classified ads, but also dating sites, live video chat, adult sites and other material the state has no basis to

2

restrict.  The Act is also impermissibly vague:  its key terms are either undefined or defined far too broadly, giving no clear notice of what is prohibited.

***Finally***, the Act violates the Commerce Clause because it seeks to regulate conduct outside of and having no connection to Tennessee.  A website hosting a paid ad by a user in New York seeking to meet others in that state could still be prosecuted in Tennessee if the ad is found to violate the Act's broad and vague standards.

## II.     BACKGROUND

### A.     State AGs' Crusade Against Adult-Oriented Internet Advertising.

In 2008, a group of state attorneys general ("AGs") began a crusade against online adult-oriented advertising.  They initially focused on craigslist, which in November 2008 issued a joint statement with 43 AGs (including Defendant Tennessee Attorney General Robert E. Cooper, Jr.) outlining measures craigslist agreed to undertake to prevent misuse of its "erotic services" category.  *See* Declaration of Ambika K. Doran (attached as Exhibit 1, "Doran Decl."), ¶ 2, Ex. A.  Later, craigslist took more steps, including replacing the "erotic services" category with an "adult services" category.  *Id.* ¶ 3 & Ex. B.  Nonetheless, a subgroup of 17 AGs (again including Cooper) demanded that craigslist remove its adult services section entirely.  *Id.*, ¶ 4, Ex. C.

Under this pressure, craigslist in 2010 dropped its adult services category.  *Id.* ¶ 5, Ex. D.  Soon afterward, adult ads migrated to other craigslist categories and other websites, including Backpage.com, which operates the second largest online classified ad service available nationwide.  Declaration of Carl Ferrer (attached as Exhibit 2, "Ferrer Decl.") ¶ 2.  Backpage.com hosts millions of user posts each month in numerous categories (*e.g.*, buy/sell/trade, automotive, rentals, real estate, jobs, forums, dating, adult and services) and subcategories.  *Id.* ¶ 5 & Ex. A.

3

Less than a week after craigslist eliminated its adult services category, the same 17 AGs wrote Backpage.com to insist that it "like craigslist [should] shut[] down the adult services section of its website." Doran Decl. ¶ 6 & Ex. E. In June 2010, the National Association of Attorneys General ("NAAG") sent and publicly released a letter to Backpage.com that leveled derogatory accusations and requested extensive information "in lieu of a subpoena." *Id.* ¶ 7 & Ex. F. Attorney General Cooper signed this letter, too. NAAG President Rob McKenna (Washington's AG, who had just announced his candidacy for governor of that state) admitted the AGs "have little legal standing to forcibly shut down the site" and the "broad immunity" provided to websites by the CDA for third-party content is a "high barrier." *Id*. ¶ 8 & Ex. G.

Backpage.com has attempted to cooperate with the AGs but has resisted the demand to eliminate the adult category. Backpage.com maintains that censorship is not the solution to human trafficking and child exploitation, but rather that technology and responsible businesses – like Backpage.com – can help fight these problems.

**B.      Backpage.com's Efforts to Police and Prevent Misuse of Its Website.**

Backpage.com works to prevent misuse of its website, making clear that users may not offer illegal services and emphasizing that content relating to child exploitation is prohibited. Ferrer Decl. ¶ 8 & Ex. B (Terms of Use forbid posts related to "exchanging sexual favors for money or other valuable consideration" and "any material … that exploits minors"); Ex. C ("**Any post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the Cybertipline for law enforcement.**" (emphasis in original)). Users seeking to post or view material in the adult category must verify that they are at least 18 years old. *Id.* ¶ 10. The site asks users to report any post that may relate to exploitation of minors or human trafficking and contains links to websites of the National Center for Missing and Exploited Children and the National Human Trafficking Resource Center. *Id.* ¶ 10 & Exs. D & E.

4

Backpage.com takes extensive voluntary measures to police user content for abuse and illegal activity. It automatically filters nearly all ads for some 26,000 terms, and conducts two levels of manual review with a staff of over 100 personnel. *Id.* ¶ 13. Through these reviews, Backpage.com blocks over a million posts each month. *Id.* ¶ 14. It refers user-submitted ads that it suspects may relate to child exploitation to the National Center for Missing and Exploited Children (including over 400 ads in April 2012 alone). *Id.* Backpage.com also cooperates with law enforcement by promptly responding to subpoenas and using technological tools to supply evidence for investigations and prosecutions. *Id.* ¶ 15.

### C. Washington Passes the First State Law Criminalizing Ads Ostensibly Concerning "Commercial Sexual Abuse of Minors."

In Washington State, the AG's office worked with legislators to craft a bill purporting to address "advertising commercial sexual abuse of a minor." The first draft was introduced in January 2012. Doran Decl. ¶ 9, Ex. H. The bill went through numerous revisions, in part because legislators acknowledged it raised serious issues under the CDA and the First Amendment. *Id.* ¶ 10, Ex. I (quoting the bill's sponsor: "We kept asking, what does constitute a violation of freedom of speech …, what does constitute a violation of the federal [CDA]?" and "I suppose there could be a case made that, 'Well, they're chilling our free speech.'"). The Washington legislature approved the much-revised bill, which the governor signed on March 29, 2012. *Id.* ¶ 11, Ex. J. The law was scheduled to take effect June 7, 2012, but was enjoined by the U.S. District Court for the Western District of Washington on June 5 (discussed below).

### D. The Tennessee General Assembly Passes Public Chapter 1075, Which Is Based on the First Draft of the Washington State Bill.

On January 12, 2012, Tennessee legislators introduced Senate Bill 2371 and House Bill 2493 in the two houses of the Tennessee General Assembly. *Id.* ¶ 12, Ex. K. Initially, these identical bills only revised the offense of trafficking a person for sexual servitude (T.C.A. § 39-

5

13-309). *Id.* ¶ 13, Ex. L. On April 27, 2012, Senate Amendment 1197 was offered, adding the new crime of "advertising commercial sex with a minor." *Id.* ¶ 14, Ex. M. The amendment closely tracked the first draft of the Washington State bill. *Id.* ¶ 9, Ex. H. While Washington legislators abandoned that draft, SB 2371, as amended by SA 1197, passed both houses of the General Assembly with no changes. *Id.* ¶ 12, Ex. K. The legislative history reveals no substantive debate and little discussion other than a brief suggestion at a Senate committee hearing that the bill should be "run by" the attorney general for an evaluation of constitutional issues. *Id.* ¶ 15, Ex. N. The governor signed SB 2371 on May 21, 2012, and it was designated Public Chapter 1075. *Id.* ¶ 16, Ex. O.

The provisions of the Act relevant here are contained in section 3, which adds a new section to the Tennessee Code, T.C.A. § 39-13-314, as follows:

(a) A person commits the offense of advertising commercial sexual abuse of a minor if the person knowingly sells or offers to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act, as defined in § 39-13-301, with a minor.

(b)(1) Advertising commercial sexual abuse of a minor is a Class C felony.

(2) In addition to any authorized period of incarceration, advertising commercial sexual abuse of a minor is punishable by a minimum fine of ten thousand dollars ($10,000).

(c) In a prosecution under this statute, it is not a defense that the defendant did not know the age of the minor depicted in the advertisement. It is a defense, which the defendant must prove by a preponderance of the evidence, that at the time of the offense, the defendant made a reasonable bona fide attempt to ascertain the true age of the minor appearing in the advertisement by requiring, prior to publication of the advertisement, production of a driver license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written allegations of the minor's age or the apparent age of the minor.

In addition, section 1 of the Act defines three key terms:

"Advertisement" means a notice or an announcement in a public medium promoting a product, service, or event, or publicizing a job vacancy;

"Commercial sex act" means any sexual act for which something of value is given or received;

"Minor" means an individual who is less than eighteen years old[.]

The Act makes this advertising offense a Class C felony – the same class as kidnapping, voluntary manslaughter, robbery, and arson (*see* T.C.A. §§ 39-13-303, 39-13-211, 39-13-401, and 39-14-301) – with a penalty of 3 to 15 years in prison and a fine of at least $10,000 per violation.  Pub. Ch. 1075 § 3(b); *see* T.C.A. §§ 40-35-110, 111.  Absent relief from this Court, the Act will take effect July 1, 2012.  Pub. Ch. 1075 § 5.

## E.    A Federal Court Enjoined Washington State's Law.

On June 4, Backpage.com filed an action in federal court in Washington, seeking a determination that SB 6251 is unconstitutional and violates the CDA.  Doran Decl. Ex. P. Backpage.com also moved for a temporary restraining order, which the court granted the next day.  *Id.* ¶ 18, Ex. Q.  The court found "Backpage.com has shown a likelihood of success on the merits of its claim … as well as irreparable harm, the balance of equities tipping strongly in its favor, and injury to the public interest, justifying injunctive relief."  *Id.* ¶ 4.  The court has scheduled a preliminary injunction hearing for July 20, 2012.  *Id.* ¶ 19, Ex. R.

## F.    The Act Will Affect Thousands of Websites and Online Providers.

In Washington, lawmakers made plain that their new law was aimed at Backpage.com. *Id.* ¶ 20, Ex. S (bill sponsor stating:  "I would love to have the escort services section [of Backpage.com] shut down completely").  Public Chapter 1075 likewise appears to target Backpage.com, given that it was based on the Washington bill and given AG Cooper's active participation in demanding that Backpage.com eliminate its adult category.

However, the Act will apply to thousands of other online service providers that charge users or provide advertising (such as links to other websites), including most obviously,

7

craigslist.org, but also social networking sites (Facebook, MySpace), dating sites (Match.com, Passion.com), search engines (Google, Bing, Yahoo!, which sell sponsored links), adult video and live chat sites, and many more.  For example, escort ads continue to appear on craigslist and increasingly on other sites such as Facebook.  *Id.* ¶ 21, Ex. T.  A study conducted in New York City found that 61% of sex workers used craigslist, while 83% had Facebook pages.  *Id.* ¶¶ 22-23, Exs. U, V.  As one commentator put it, "Keeping these ads from popping up online is like trying to keep frogs in a bucket."  *Id.* ¶ 21, Ex. T.

### III.  ARGUMENT

### A.  Standards for TRO or Preliminary Injunction.

"[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had."  *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996).  The standard for issuing a TRO is the same as for a preliminary injunction. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).  In both contexts, the court should consider whether:  (1)  the moving party has shown a strong likelihood of success on the merits; (2) the moving party will suffer irreparable harm if the injunction is not issued; (3) the injunction would cause substantial harm to others; and (4)  the public interest would be served.  *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 685 (6th Cir. 2002).

In cases implicating the First Amendment, the first factor, likelihood of success on the merits, is often determinative.  *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).  This is because "the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute," *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quotation omitted), and "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Backpage.com is likely to succeed on its claims that the Public Chapter 1075 is unconstitutional and violates the CDA.  Defendants cannot justify the chilling effect the Act will cause.  Irreparable harm is presumed, and in any event is obvious.  The public interest strongly favors preventing even temporary loss of free speech rights.

**B.      Backpage.com Has A Strong Likelihood of Success on the Merits.**

**1.      Section 230 of the CDA Preempts Public Chapter 1075.**

Section 230 of the CDA unequivocally bars state laws that impose liability on interactive computer services based on third-party content.  Because this is precisely what Public Chapter 1075 seeks to do, it contravenes section 230 and is preempted.

Three provisions of section 230 are important here.  First, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Second, "no liability may be imposed under any State or local law that is inconsistent with" section 230.  47 U.S.C. § 230(e)(3).  Third, providers may not be held liable for "any action voluntarily taken in good faith to restrict access to or availability" of material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  47 U.S.C. § 230(c)(2).

These provisions reflect two fundamental goals.  "First, Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) (section 230 is meant "to promote freedom of speech").  Second, Congress sought to encourage online service providers "to self-police" for offensive material, by providing immunity for such voluntary efforts.  *Batzel*, 333 F.3d at 1028.

"The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010).[1]  This immunity avoids the "obvious chilling effect" on free speech posed by the specter of liability based on third-party content.  *Zeran v. Am Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).[2]  Courts in this circuit recognize that "[n]ear-unanimous case law holds that Section 230(c) affords immunity to [interactive computer services] against suits that seek to hold an ICS liable for third-party content."  *Eckert v. Microsoft Corp.*, 2007 WL 496692, at \*3 (E.D. Mich. Feb. 13, 2007) (under section 230, host of online board not liable for defamatory posts by third parties); *Energy Automation Sys., Inc. v. Xcentric Ventures, LLC*, 2007 WL 1557202 at \*12 n.6 (M.D. Tenn. May 25, 2007) (recognizing CDA would immunize defendants for any claim "treating them as publishers.").

Section 230 provides immunity for websites that post third-party ads concerning unlawful conduct, whether or not the provider knew or had reason to know of the unlawfulness.   In *Chicago Lawyer's Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008), the Seventh Circuit held craigslist immune for ads that violated the Fair Housing Act, reasoning that the site was not obligated to and could not practically review all ads posted by users.  Under section 230, a plaintiff "cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful [conduct]."  519 F.3d at 672; *see also Zeran*,

---

[1] *Accord, Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 260 (4th Cir. 2009); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003); *Blumenthal v. Drudge*, 992 F. Supp. 44, 50 (D.D.C. 1998).

[2] The Sixth Circuit has yet to construe section 230.  *See Doe v. SexSearch.com*, 551 F.3d 412, 415 (6th Cir. 2008) (affirming district court decision that an online adult dating service could not be held liable to the plaintiff, who had been prosecuted for illegal activity with an underage partner he met on the site, but not addressing issues regarding interpretation of section 230 immunity).

129 F.3d at 328 (AOL immune from claims based on defamatory post even after being notified and failing to remove it).

Section 230 immunity also applies to state criminal laws: "[N]o liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). "[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted). Section 230's grant of immunity under any state law thus includes state criminal laws. *People v. Gourlay*, 2009 WL 529216, at *3 (Mich. Ct. App. Mar. 3, 2009) ("the phrase 'any State or local law' includes … criminal laws"); *Voicenet Comms., Inc. v. Corbett*, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006) (CDA's plain language provides "immunity from inconsistent state criminal laws").

To find immunity under section 230, "(1) the defendant must be a provider or user of an 'interactive computer service'; (2) the asserted claims must treat the defendant as a publisher or speaker of information; and (3) the challenged communication must be 'information provided by another information content provider.'" *Batzel*, 333 F.3d at 1037; 47 U.S.C. § 230(c)(1), §§ 230 (f)(2), (3). Backpage.com meets all three elements, as do countless websites subject to the Act. First, websites are the quintessential "interactive computer services." *See, e.g.*, *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049 (E.D. Mo. 2011) (Backpage.com meets statutory definition); *Chicago Lawyers' Comm.*, 519 F.3d at 672 (same for craigslist). Second, the posts targeted by the Act are created by third parties, for which websites like Backpage.com are mere conduits. *Id.* at 671 (a website "'causes' postings only in the sense of providing a place where people can post"). Third, by making it a felony to "sell or offer to sell an advertisement" – *i.e.*, a post provided by a third-party – the Act treats websites as the publishers of that information. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009) ("what matters is not the name of the cause of action … [but] whether [it] inherently requires the court to treat

11

the defendant as the 'publisher or speaker' of content provided by another"). The Act impermissibly holds online service providers "liable for [their] exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330.

The Act thus fundamentally contradicts section 230 and the Internet freedom it protects. Congress recognized in section 230 that Internet businesses are different from brick-and-mortar ones. The Internet is worldwide. Online providers are not physically located every place their services are available; many services are global. Most online services that "sell or offer to sell" ads in Tennessee are located outside of the state, have no direct contact with the users providing content, and have no way to identify or obtain identification from them. Requiring identification for each posting would be so burdensome, expensive and impractical – and the risks of an error so great – that websites likely will preclude all posts that come close to the Act's proscriptions.

Even assuming some sites are willing to take on the risk and burden of mandating identification, most users likely would be dissuaded from posting, because of the invasion of their privacy. And, if the State can require identification for posts implicitly referring to sex for "something of value," can it do the same for all posts seeking sexual encounters, or for businesses selling sex-related products or services (*e.g.*, Ebay's "Adult Only" category)? Section 230 does not permit a State to squelch online speech in this way.

Indeed, the Act does not even require that an offending ad be published. It is a felony merely to "offer to sell." If a user submits an ad that Backpage.com **blocks**, do the company and its employees still face prison terms and fines simply for the "offer to sell?" In this way too, the Act ignores the nature of third-party Internet content. Sites like Backpage.com do not create this content; millions of users across the country do. Section 230 recognizes that online services provide forums for Internet communications and that the parties who should be held responsible

12

for illicit content are the users who create it, not the service providers.  Because the Act imposes criminal liability on online service providers as publishers, it is flatly barred by section 230.

> **2.  Public Chapter 1075 Violates the First and Fourteenth Amendments Because It Eliminates Scienter.**

Under the First Amendment, governments cannot impose criminal liability for distributing expressive materials without sufficient proof of scienter.  More specifically, the State cannot hold a party criminally liable for distributing sexually related materials depicting minors unless the law requires proof that the defendant **knows** a person depicted **is** a minor.  The Act is unconstitutional because it lacks this element.

In *Smith v. California*, 361 U.S. 147 (1960), the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books.  The Court noted that *mens rea* is a fundamental tenet of Anglo-American criminal jurisprudence, and the power to create strict liability criminal offenses is limited, especially when the First Amendment is implicated.  *Id.* at 150.  Even though the First Amendment does not protect obscene speech, the Court concluded that a bookseller could not be held criminally liable without proof of scienter concerning the contents of a book:

> It has been well observed of a statute construed as dispensing with any requirement of scienter that:  'Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop.  It would be altogether unreasonable to demand so near an approach to omniscience.'  And the bookseller's burden would become the public's burden….  The bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly.

*Id.* at 153-54 (footnote and internal citations omitted).

The Court reiterated this principle in *New York v. Ferber*, 458 U.S. 747 (1982), which upheld a New York law criminalizing distribution of sexually explicit depictions of minors, largely because the statute **did** require scienter.  Again, even though such materials were not

13

entitled to First Amendment protection, the Court cautioned that "criminal responsibility may not be imposed without some element of scienter on the part of the defendant." *Id.* at 765.

Thereafter, in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the Court interpreted 18 U.S.C. § 2252 (prohibiting interstate transfer of sexually explicit materials depicting minors). The Ninth Circuit had held that the statute was facially unconstitutional because it did not contain any requirement that a defendant know that at least one performer in a production was under age 18. *United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1291-92 (9th Cir. 1992). The Supreme Court interpreted the law differently, holding that "the term 'knowingly' in § 2252 extends to both the sexually explicit nature of the material and to the age of the performer" because "a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts." 513 U.S. at 78; *see also Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material."); *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611-13 (6th Cir. 2005) ("Any statute that chills the exercise of First Amendment rights must contain a knowledge element.") (quoting *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992)).

Public Chapter 1075 lacks the required scienter element with respect to the age of a person depicted in an offending ad. The Act defines the offense as occurring when "[a] person knowingly sells or offers to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act … with a minor." Read logically, the Act does require scienter in the sense that a defendant must "knowingly sell[] or offer[] to sell an advertisement," but does not require proof that the defendant knows a person depicted or described in an ad is a minor. Even if the language concerning what "would appear to a reasonable person" is considered to be a scienter requirement, it becomes an oxymoron in

14

light of subsection 3(c) of the Act. That subsection expressly dispenses with scienter concerning the age of the person depicted in an ad, because it provides that "it is **not a defense** that the defendant **did not know the age of the minor** depicted" (emphasis added), and the only way to escape strict liability is by attempting to ascertain the minor's age by requiring certain government or school identification.

Thus, the Act permits a felony conviction for selling or offering to sell ads or other Internet content even if the defendant is unaware that the ad or content relates to a minor at all – and, indeed, it may not relate to a minor, because a conviction can be based solely on content that reasonably "would appear to" be related to a minor. This would require the sort of distributor's omniscience and would result in the severe chilling of speech that the Supreme Court has found is plainly unconstitutional under the authority discussed above.

### 3. Public Chapter 1075 Violates the First Amendment.

#### a. Public Chapter 1075 Cannot Survive Strict Scrutiny.

Content-based restrictions on speech, particularly those enforced by criminal penalties, are "a repressive force in the lives and thoughts of a free people." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004). The First Amendment "demands that content-based restrictions on speech be presumed invalid, and that the Government bear the burden of showing their constitutionality." *Id.* (citations omitted). To rebut this presumption, the State must show the law passes strict scrutiny, *i.e.*, that it is "narrowly tailored to promote a compelling Government interest," and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). To pass strict scrutiny, the State must prove the Act restricts speech "no further than necessary to achieve the goal, for it is important to assure that legitimate speech is not chilled or punished." *Ashcroft v. ACLU*, 542 U.S. at 666. "It is rare that a regulation

15

restricting speech because of its content will ever be permissible." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (quoting *Playboy*, 529 U.S. at 818).

Public Chapter 1075 is plainly content-based, because it imposes criminal liability based on the content of speech. Liability attaches only if an ad concerns sex for "something of value" and "appears to" involve a minor. *See Norton v. Ashcroft*, 298 F.3d 547, 552 (6th Cir. 2002) ("A statute that regulates speech or conduct 'based on hostility … toward the underlying message expressed' is content-based." (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992)); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1251 (6th Cir. 1997) (law making "explicit reference to any particular type of speech" is content-based).

The Act fails strict scrutiny because it is not narrowly tailored, and less restrictive alternatives exist to further the State's asserted purpose. Assuming that the purpose is to combat child sex trafficking, the Act is not narrowly or even rationally tailored to achieve that end. The customary method for deterring unlawful conduct is to impose punishment on those who engage in it. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). The State can (and has) enacted criminal laws to punish persons who sexually exploit minors. *See, e.g.*, T.C.A. §§ 39-13-506, 39-13-309. The State could impose criminal liability on persons who knowingly post online ads for sex trafficking of children, as Connecticut did after rejecting a bill similar to the Act. Doran Decl., ¶ 24, Ex. W. Or, the State could investigate ways to use technology and the Internet to combat exploitation and trafficking in collaboration with Internet businesses, as the California AG has recently done. *Id*. ¶ 25, Ex. X. Public Chapter 1075 does none of these things. It imposes no criminal liability on those who post offending ads – so a pimp cannot be prosecuted under the law but the persons running the website he uses can be convicted as felons. This approach – imposing Internet censorship or eliminating a substantial swath of lawful speech – is far from the least restrictive alternative available to the State.

16

The Act is also underinclusive, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 131 S. Ct. at 2740. First, the Act's sole defense requires production of "a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement."[3] Yet, many of these documents do not have photographs and even those that do (such as a driver's license) can be forged. By contrast, visual observation that a person is well over 18 or a sworn affidavit or declaration (either of which would be competent evidence in this Court, *see, e.g.*, 28 U.S.C. § 1746) is insufficient to avoid liability. Even if a person posting content provides identification, the post might actually describe someone else (especially given that the Act applies to postings without photos), or a photo or text may later change. Second, the Act is underinclusive because it can only reach those within the United States. Such a censorship effort will increasingly drive website providers offshore and out of the reach of U.S. law enforcement, given the global nature of the Internet. Finally, the Act is underinclusive because it applies only to publishers who "sell or offer to sell" content. A website or other publisher that does not charge for placement of ads – even ads that plainly propose unlawful commercial sexual activity with minors – faces no liability. This also materially undermines the State's ostensible purpose, because requiring credit card payment for adult-oriented ads (as Backpage.com does) discourages abusive posts and provides a valuable means to identify and track users engaged in illegal activity. *See* Ferrer Decl. ¶ 6. Indeed, state AGs (including Defendant Cooper), recognized this fact when they asked craigslist to start charging for adult ad category posts. *See* Doran Decl. Ex. A (point III).

---

[3] The statute offers no defense for an ad that violates section 3(a) but does not "depict" any specific individual. This is both irrational and underinclusive. A publisher who prints an ad offering sex with a pictured minor would have a defense if the publisher attempts to verify the subject's age. But a publisher of a text-only ad that suggestively offers sexually oriented services with unidentified "teenagers" could not escape liability.

## b.        The Statute Is Overbroad and Restricts Protected Speech.

In addition, the Act violates the First Amendment because it is overbroad.  The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).  A law is "unconstitutional on its face if it prohibits a substantial amount of protected expression." *Id.*[4]  This is especially so for criminal restrictions, because "criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997).

The Act is overbroad, first, because it sweeps within its ambit lawful content outside the State's goal of preventing sexual exploitation of minors.  The Act is not limited to content depicting minors – it bars any material that "would appear to" concern a minor, even if the content actually concerns only adults.  The Supreme Court has held that the government may not suppress speech that merely "appears to" depict activity harmful to minors, when no actual harm to minors occurs.  In *Free Speech Coalition*, the Court held that the government's compelling interest in protecting children from abuse could not justify a statute banning sexually explicit images that "appear to" depict minors.  Such "virtual child pornography," the Court recognized, does "not involve, let alone harm, any children in the production process," 535 U.S. at 241-42, and the Court concluded that other purported harms were too attenuated to justify a criminal speech restriction.  *Id*. at 249-55.  The Court rejected the government's attempt to uphold the statute on the ground that the prohibited expression was "virtually indistinguishable from child pornography," finding that the state interest in protecting children applies to the "production of the work" rather than its content.  *Id*. at 249.  "[T]o protect speech for its own sake, the Court's

---

[4] *Accord Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 387 (6th Cir. 2001) ("any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down").

18

First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct." *Id*. at 253. By barring publications that "appear to" depict minors, even if only adults are involved, the Act violates this principle.

Indeed, Public Chapter 1075 prohibits speech even more removed from any legitimate state interest than the overbroad statute at issue in *Free Speech Coalition*. The Act allows felony liability not only in the absence of an exploited minor, but also in the absence of any commercial sex act or any published ad, because it imposes felony liability for ads or content that "***appear to be*** for the purpose of engaging in ***what would be*** a commercial sex act" (emphasis added). And the Act does not require that an offending ad even be published – felony liability arises if a party merely "***offers*** to sell" such an ad, apparently even if the publisher blocks the ad (as Backpage.com does with millions of posts each year). Criminalizing such expression, or proposed expression, does nothing to advance the State's asserted interest in protecting minors.

Likewise overbroad is the definition of "commercial sex act" in the Act, *i.e.*, "any sexual act for which something of value is given or received." A website that lawfully offers pay-per-view sexual content or live chat of a sexual nature falls within the definition. Thus, an adult website that features an ad for any of hundreds of such pay-per-view or live chat sites (e.g., Jasminelive.com) could be guilty of a felony in Tennessee. Moreover, the term "something of value" is unlimited, and not confined to prostitution.[5] The definition is all the more overbroad because presumably all consensual sexual relationships involve an exchange of "something of value" between the participants. Thus, many millions of sexually oriented personals and dating ads would fall within the Act's prohibitions.[6]

___

[5] "Prostitution" under the Tennessee criminal code is defined as engaging in "sexual activity ***as a business***[.]" T.C.A. 39-13-512(6) (emphasis added).

[6] Because the Act reaches personals ads, dating posts and much other user-submitted content, it cannot be viewed as affecting only commercial speech. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 925 (6th Cir.

Given this breadth, the Act would force online providers to act as censors for millions of user-submitted posts daily. An offending ad could appear anywhere on websites such as Backpage.com and craigsist.org, as demonstrated by the fact that adult escort ads continue to appear on craigslist even after it eliminated its adult category. The Act reaches much further, however, because offending posts could appear on dating sites, social networking sites, and countless other sites. If such a post involves someone who merely "appears to be" a minor, the seller of the ad would face felony liability – even if the person involved was not actually a minor, even if no sexual act occurs, and even if the individual placing the ad does nothing unlawful.[7]

The Act's affirmative defense for publishers requiring age verification is not enough to save it. "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. ACLU*, 542 U.S. at 670-71. The age verification requirement for online providers is also vastly overbroad. As discussed above, the identification requirement is practically impossible and disregards the nature of the Internet. *Cf. Reno*, 521 U.S. at 868-70. Even assuming a website could do this, millions of adults would have to present identification simply to place a personal ad, post to a dating website or otherwise publish content relating to consensual sex. Given the sensitive nature of adult-oriented speech,

---

2003) (publications that "do not propose a commercial transaction … are entitled to the full protection of the First Amendment"). When a statute seeks to regulate both commercial and non-commercial speech, it is subject to heightened scrutiny. *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1146-47 (9th Cir. 1998) (applying strict scrutiny to anti-leafleting law challenged by company promoting erotic dance establishment, on ground that law reached commercial speech that was inextricably intertwined with noncommercial expression). Regardless, the Act cannot satisfy the third and fourth elements of the intermediate scrutiny analysis of *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557 (1980). As discussed herein, the Act does not directly advance the State's ostensible purpose, and restricts more speech than necessary to achieve the State's end.

[7] The Act cannot be sustained on the basis that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008). This might be a defense if the statute simply imposed liability on content providers who knowingly post materials intending they be interpreted as ads for commercial sexual exploitation of minors, similar to the law at issue in *Williams* (18 U.S.C. § 2252A). But the Act goes far beyond this, as discussed above.

"many Web users [will be] simply unwilling to provide identification information." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 259 (3d Cir. 2003) (striking age-verification requirement in law criminalizing transmission of material harmful to minors).

### c. Public Chapter 1075 Is Unconstitutionally Vague

Public Chapter 1075 is also void for vagueness because its "prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (quoting *United Food & Commercial Workers Union Local 1099 v. Sw. Ohio Reg. Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998)). "Without clear standards guiding the discretion of public officials with enforcement authority, there is a risk that those officials will administer the policy based on impermissible factors." *Id.* (internal quotations omitted). *See Reno*, 521 U.S. at 871-72 (vagueness raises "special First Amendment concerns" when it has an "obvious chilling effect on free speech" and threatens criminal penalties and discriminatory enforcement). "A more stringent test [for vagueness] applies if the provision interferes with constitutional rights" and if the provision involves criminal penalties. *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007). The Act, which criminalizes speech, is thus subject to a heightened test for vagueness.

The Act's key term, "commercial sex act," is too vague to provide a reasonable opportunity to know what is prohibited. "Commercial sex act" is defined as a "sexual act for which something of value is given or received." Neither "sexual act" nor "something of value" is further defined. The omission of any definition of "sexual act" is particularly glaring given that similar terms are defined elsewhere in the criminal code, yet these definitions are not

consistent, and are not incorporated into the Act.[8] In the absence of any statutory definition, parties that publish third-party content are left to guess whether the term "sexual act" encompasses, for example, ads for phone sex services, nude dancing, online chat services, adult pay-for-view websites or other legal sexually-oriented material. The term "something of value" is likewise vague: as noted above, it is not limited to commercial consideration but encompasses any exchange of value.

Given the severe penalties imposed by the Act, and the burden of its sole defense, the vagueness of the statute only further assures that online services will respond by precluding postings or blocking websites that might contain any content remotely approaching the strictures of the law. The practical effect of this will be to turn websites and other online publishers into Internet censors – on the pain of felony liability – and to chill vast amounts of protected speech.

### 4. SB 6251 Violates the Commerce Clause.

Congress alone has the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. A "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 645 (6th Cir. 2010) (state law "that controls extraterritorial conduct is per se invalid"). "Because the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities" without violating this rule. *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (striking law prohibiting transfer of sexually explicit materials to minors). Regulation of the Internet "highlights the

---

[8] The obscenity law, for example, includes a definition for "sexual conduct," focusing on "representations," of specified acts. T.C.A. § 39-17-901(14). The child exploitation statute contains another, different definition for "sexual activity." T.C.A. § 39-17-1002(8).

likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239-40 (4th Cir. 2004).

Nearly every federal court to have confronted individual states' efforts to regulate transmission of harmful material to minors via the Internet has found the state law unconstitutional.[9]  Such laws control extraterritorial conduct in two ways.  First, "there is no guarantee that a message" from a resident of one state to another "will not travel through other states en route." *ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999).  Second, because individuals have no way of limiting their audience on the Internet, they are subject to any restrictions created by any state. *Am. Booksellers*, 342 F.3d at 103.  If state-by-state regulation of the Internet such as this were allowed, online service providers like Backpage.com would have to conform their practices nationwide based on the most-restrictive state's requirements.

Under this authority, the Act is invalid.  The statute applies to conduct anywhere, with no requirement that the acts of "sell[ing] or offer[ing] to sell" prohibited ads takes place in Tennessee (or even that the publication relates at all to Tennessee).  Posts by individuals in Virginia, Ohio, or Ontario would be subject to the Act.  Personal ads or dating site posts published in Memphis, seeking encounters in Arkansas, would face criminal liability.  The Tennessee legislature has attempted to project its policy choices onto residents of other states,

---

[9] *Id.  See also ACLU v. Johnson*, 194 F.3d 1149, 1160-61 (10th Cir. 1999); *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 662 (E.D. Pa. 2004) (invalidating law requiring ISPs to block access to sites containing child pornography); *See Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389, 396 (D.S.C. 2003); *Cyberspace Commc'ns Inc. v. Engler*, 142 F. Supp. 2d 827, 830-31 (E.D. Mich. 2001); *Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).

creating an undue burden on interstate commerce, and putting users at risk of inconsistent state regulation. This is impermissible.[10]

### C. Backpage.com, Other Online Services, and the Public Will Suffer Irreparable Harm If Public Chapter 1075 Is Not Enjoined.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Connection Distrib. Co.*, 154 F.3d at 288 (irreparable injury presumed from loss of First Amendment rights). Here, irreparable harm to Backpage.com, other online providers, and the public may be presumed if enforcement of the Act is not enjoined. Moreover, ample evidence supports such a finding. If the State tries to enforce the Act, Backpage.com and countless other services will be faced with the intractable choice of censoring third-party content to exclude anything potentially prohibited (a practical impossibility), or risk felony charges and penalties.

### D. Granting Injunctive Relief Is In the Public Interest.

The Sixth Circuit recognizes that for purposes of injunctions involving free speech principles, "the public interest lies in a correct application" of the First Amendment. *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991). As discussed above, the Act would burden vast amounts of protected speech, and so the public interest also strongly favors granting injunctive relief.

### E. The Balance of the Equities Favors Granting Injunctive Relief.

Finally, the balance of equities favors granting injunctive relief. If the Act takes effect, Internet service providers will be forced to censor or block vast amounts of content, or may be put out of business altogether. On the other hand, delaying enforcement of the Act will not harm the State, which has at its disposal numerous other laws it can use to combat sexual exploitation

---

[10] Even if the Court were to find the statute does not directly control out-of-state commerce, it is invalid because "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

of children and human trafficking, without infringing fundamental rights under the Constitution and the CDA.[11]

## IV.    CONCLUSION

For the reasons stated above, Plaintiff's motion for a temporary restraining order and preliminary injunction should be granted.

Dated this 27th day of June, 2012.

<div style="margin-left:40%">

Respectfully submitted,

s/ Lucian T. Pera
Lucian T. Pera (Tenn. BPR No. 11641)
ADAMS AND REESE LLP
80 Monroe Avenue, Suite 700
Memphis, TN 38103
Tel: 901-524-5278
Fax: 901-524-5378
Lucian.Pera@arlaw.com

Craig L. Meredith (Tenn. BPR No. 29506)
ADAMS AND REESE LLP
424 Church Street, Suite 2800
Nashville, Tennessee 37219
Tel: (615) 259-1067
Fax: (615) 687-1508
Craig.Meredith@arlaw.com

James C. Grant (*pro hac vice* application pending)
Eric M. Stahl (*pro hac vice* application pending)
Ambika K. Doran (*pro hac vice* application pending)
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: 206/757-8096
Facsimile: 206/757-7096

</div>

---

[11] No bond should be required in support of the injunction. "The amount of security given by an applicant for an injunction is a matter for the discretion of the trial court, which may in the exercise of that discretion even require no security at all." *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982). Courts regularly do not require bonds for injunctions based on constitutional challenges. *See, e.g.*, *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996). This Court has required no bond to secure an injunction that would "cause no discernible monetary damage to the defendants." *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 2006 WL 1638537, at *22 (M.D. Tenn. June 6, 2006).

jimgrant@dwt.com
ericstahl@dwt.com
ambikadoran@dwt.com

*Attorneys for Plaintiff Backpage.com, LLC*