# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BACKPAGE.COM, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:12-cv-00654** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Griffin** |
| **ROBERT E. COOPER, JR.,** | ) | |
| **Attorney General, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Pending before the Court is Plaintiff Backpage.com, LLC's Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") (Doc. No. 4). In this action, Backpage.com, LLC ("Backpage.com") challenges a recently enacted Tennessee law, Tenn. Code Ann. § 39-13-314 ("section 39-13-314" or "the statute"), that criminalizes the sale of certain sex-oriented advertisements. Backpage.com launches a multi-prong challenge to the law, claiming it is preempted by federal internet law and violates the First Amendment and Commerce Clause of the U.S. Constitution.

Child sexual exploitation is an evil that states have an undisputed interest in dispelling. However despicable this evil, though, the Constitution stands as a shield against broad assaults by states on the rights of their citizens. The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix. Nor may a state enforce a law that flatly conflicts with federal law. Yet, this appears to be what the Tennessee legislature has done in passing the law at issue. For the reasons detailed below, the Court finds Plaintiff is likely to succeed in its challenge, and **GRANTS** its Motion. The state law is hereby **ENJOINED**.

1

## I. BACKGROUND

### A. Plaintiff Backpage.com

Backpage.com operates an online classified advertising service that is estimated to be the second-largest such service in the United States. (Doc. No. 4-3 ¶ 2.) The website works by allowing users to post their own advertisements in a range of categories: local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, forums, dating, adult, and services. (*Id.* ¶ 5.) Users posted more than 3.3 million ads on the website in the month of April 2012. (*Id.* ¶ 4.) These advertisements are organized on the website geographically by state and metropolitan area; there are local home pages for seven areas within Tennessee: Chattanooga, Clarksville, Cookeville, Knoxville, Memphis, Nashville, and Tri-cities. (Doc. No. 21-3 ¶ 13, Ex. 3.) Apart from this online presence, Backpage.com does not have a physical location in the state. (Doc. No. 4-3 ¶ 20.)

Users may post ads on Backpage.com for free within the majority of its categories. (*Id.* ¶ 6.) However, the site charges between $1 and $17 per advertisement in the adult category, and $1 for an ad in the dating category. (*Id.*) Users must pay by credit card. (*Id.*) The charges discourage abusive posting and provide data for Backpage.com to identify and track users engaged in illegal activities. (*Id.*)

Backpage.com's Terms of Use state that users may not post ads for illegal services, post "any solicitation directly or in 'coded fashion' for any illegal service exchanging sexual favors for money or other valuable consideration," or post "any material . . . that exploits minors in any way." (*Id.* ¶ 8, Ex. B.) In addition, before posting an ad in the adult or dating categories, users must agree to Posting Rules that mirror the Terms of Use and prohibit "posting material that exploits minors in any way." (*Id.* ¶ 9, Ex. C.)

Before users can post or view ads in these categories, they view a disclaimer that states they must be at least eighteen years old to access the advertisements, and they must click to confirm they meet the age requirements in order to proceed. (*Id.* ¶ 10, Ex. D.) The disclaimer also states that the user agrees "to report suspected exploitation of minors and/or human trafficking to the appropriate authorities" and links to a webpage with the web addresses for the National Center for Missing and Exploited Children ("NCEMC") and the National Human Trafficking Resource Center. (*Id.*)

Every advertisement on Backpage.com contains a link that allows users to report the ad to the website; users are also encouraged to e-mail Backpage.com separately, if they believe an ad includes a threat of child exploitation. (*Id.* ¶ 11, Ex. F.)

In addition to user reports, Backpage.com monitors potentially inappropriate ads through automated and manual reviews. (*Id.* ¶ 13.) Its automated filtering system scans the majority of postings for any of more than 26,000 red-flag terms, phrases, codes, e-mail addresses, URLs, and IP addresses. (*Id.*) The site also employs more than 100 employees to monitor nearly every user submission in the adult and dating categories. (*Id.*) The employees review these posts before they appear on the website and again once they are published. (*Id.*) Through its monitoring, Backpage.com blocked or removed more than one million user submissions and reported approximately 400 submissions to the NCMEC in April 2012. (*Id.* ¶ 14.) Backpage.com also regularly works with local, state, and federal law enforcement officials by responding to subpoena requests, providing officials with Internet search tools, and removing posts and blocking users at the request of officials. (*Id.* ¶ 15.)

B.  *Sex Trafficking and Tennessee*

The trafficking of people—particularly children—across borders for commercial sexual purposes is a nationwide problem, with an estimated 200,000 to 300,000 minors at risk of

3

commercial sexual exploitation every year in the United States. (Doc. No. 21 at Ex. 5 p.8.) Many forms of prostitution fall under sex trafficking, in particular when pimps use force or coercion to keep women working for them. (*Id.*) Sex traffickers and their victims are often nomadic, traveling from state to state. (Doc. No. 21 ¶ 9.)

In 2010, the state legislature directed the Tennessee Bureau of Investigation ("TBI") to conduct a study of human sex trafficking in Tennessee, with a specific mandate to collect data on the extent of human sex trafficking in the state and to recommend improvements to the state's laws. (Doc. No. 21 ¶¶ 14–15, Ex. 4.) Published in 2011, the study's findings were based on meetings with three focus groups, two case studies, and data from an online survey of law enforcement officials, court representatives, group home representatives, state child-services officials, and guardians ad litem. (*Id.* at Ex. 5 p.12.)

The study did not explicitly quantify the number of individual cases of child sex trafficking that are reported or investigated in Tennessee on an annual basis, but asked respondents about their perceptions of the frequency of sex trafficking and to indicate how many times their agencies had reported a case of child sex trafficking or taken part in an investigation of such a case. (*Id.* at Ex. 5.) While the study found that sex trafficking was a significant problem in Tennessee (*Id.* ¶ 16), participants' perceptions of the frequency of human sex trafficking varied: 5 percent of respondents stated sex trafficking occurred "all the time," 20 percent stated it happened "often," 33 percent stated it occurred "sometimes," 19 percent stated it was "rare," and 23 percent stated it was "extremely rare" (*Id.* at Ex. 5 p.19). The distribution of incidents also varied significantly: 66 percent of the more than 800 entities in the study had not reported or investigated a case of child sex trafficking in the past twenty-four months; while almost 3 percent reported or investigated more than 100 such cases. (*Id.* at Ex. 5 p.20.)

4

Similarly, sixty-eight counties (72 percent of counties) in the state have reported at least one case of sex trafficking of a minor, with four counties reporting more than 100 such cases. (*Id.*)

The study also contained recommendations from the group discussions on specific legal measures to combat sex trafficking. (*Id.* at Ex. 5 pp.3, 30–31, 34, 37–38, 48–50.) These focused on compassionate custody, safe haven laws, enhanced asset forfeiture for pimps and Johns, enhanced penalties for sex trafficking within restricted areas, graduated offender sentencing, a sex offender registry for persons convicted of sex trafficking, and victim restitution. (*Id.* at Ex. 5 p.49.) Of the study's numerous recommendations, none includes a restriction on the sale or publication of online advertisements. (*Id.* at Ex. 5 pp.3, 30–31, 34, 37–38, 48–50.) The online advertising of escort services is mentioned only once in the study, in one of two case studies that focused on the story of a sex trafficking victim. (*Id.* at Ex. 5 p.45.)

C. *Sex Trafficking and the Internet*

The Internet has become a favored means of advertising the availability of children for sex because advertisements can be purchased more rapidly than in other media, allowing pimps to move victims to different locations quickly. (*Id.* ¶ 10.) TBI Assistant Special Agent Margie Quin has supervised or consulted in more than twenty-five investigations of commercial child sexual exploitation since 2009. (*Id.* ¶ 6.) In most of the child prostitution investigations in which she has been involved, pimps have used online advertising services—including Backpage.com—to reach potential Johns. (*Id.* ¶ 12.) Agent Quin has routinely reviewed the websites of Backpage.com and other online advertising services for TBI investigations. (*Id.* ¶ 13.)

In 2008, craigslist—then the leading operator of online adult-oriented advertising— entered into an agreement with the attorneys general of forty-three states in which the website agreed to screen and tag objectionable advertisements, and require telephone number and credit

card verification for advertisements in its "erotic services" category. (Doc. Nos. 4-2 at Ex. A; 21 ¶ 11.) Defendant Robert E. Cooper, Jr., signed the agreement as the Attorney General of Tennessee. (Doc. No. 4-2 at Ex. A.) In 2009, craigslist eliminated its "erotic services" category of advertisements, and created an "adult services" category. (*Id.* at Ex. B, F.) Finally on Sept. 3, 2010, under pressure from the group of attorneys general, craigslist shut down its adult services section. (*Id.* at Ex. C, D.)

Immediately after this decision in 2010, Backpage.com reportedly received a spike in traffic. (*Id.* at Ex. D.) However, a study published in May 2012 found advertisements for paid sex acts had returned to other sections of craigslist, and had migrated to other websites, such as Facebook, Twitter, Tumblr, YP.com, and About.com. (*Id.* at Ex. T.) Nonetheless, Backpage.com still hosted the largest volume of these advertisements. (*Id.* at Ex. T, F.) Another study published in early 2011 found that approximately 83 percent of prostitutes in New York City maintained a Facebook page to promote their services and that, as early as 2008, used that website to connect with 25 percent of their regular clients. (*Id.* at Ex. U.) The study's author predicted Facebook would become "the leading online recruitment space" for prostitution. (*Id.*)

Beginning in 2009, the state attorneys general investigated and corresponded with Backpage.com regarding concerns over its "adult" section advertisements. (*Id.* at Ex. E.) When Backpage.com began charging for advertisements in its adult category some time between 2009 and late 2010, ads for prostitution migrated to the website's free personal ads section. As a result, Backpage.com began charging for personal ads, as well. (*Id.*) In September 2010, the same month that craigslist eliminated its adult services section, twenty-one state attorneys general—including Defendant Cooper—sent Backpage.com a letter urging it to shut down its adult section. (*Id.*) On August 31, 2011, forty-six state attorneys general sent another letter to Backpage.com, decrying the continued appearance of prostitution ads on the website and asking

6

the website to share information about its screening policies and data on the number of adult section ads it received and blocked. (*Id.* at Ex. F.) The 2011 letter reminded Backpage.com of the officials' earlier request that the website shutter its adult section. (*Id.*)

### D. Legislation in Washington

In January 2012, the Washington state legislature introduced a bill, SB 6251, that would have created criminal liability for a person who "knowingly sells or offers to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be commercial sexual abuse of a minor, if occurring in this state." (*Id.* at Ex. H.) The bill required either that the offending advertisement contain a depiction of an actual minor, or that sexual abuse of a minor occur as a result of the advertisement. (*Id.*) It also contained a provision creating an affirmative defense, if the person prosecuted could establish, by a preponderance of evidence, that he or she made a bona fide attempt to ascertain the minor's age by verifying a government identification. (*Id.*) However, ignorance of the minor's age was not a defense. (*Id.*)

The Washington legislature amended the bill twice before passing it in late February. (*Id.* at Ex. J.) Having removed the "sells or offers to sell" language, the enacted law imposes felony criminal penalties when a person "knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in the state of Washington and that includes the depiction of a minor." Wash. Rev. Code § 9.68A.104 (West 2012). The law preserves the affirmative defense language from the earlier draft. *Id.* In April 2012, after the bill was signed into law, its main sponsor told a reporter that she "would love to have the escort services section [of Backpage.com] shut down completely," but she doubted the "new law would accomplish that." (Doc. No. 4-2 at Ex. S.)

7

In June 2012, Backpage.com sued Washington officials to enjoin the law, claiming the law was preempted by the federal Communications Decency Act and violated the First Amendment and Commerce Clause of the U.S. Constitution.  (Doc. No. 4-2 at Ex. P.)  The United States District Court for the District of Washington granted a preliminary injunction on July 27, 2012.  *Backpage.com, LLC v. McKenna*, No. C12-954-SM, 2012 WL 304543 (W.D. Wash. July 27, 2012).

*E.  Legislation in Tennessee*

In January 2012, the Tennessee legislature introduced SB 2371/HB 2493 ("SB 2371"), which, in its original form, would have amended the state criminal code to include an offense for human sex trafficking.  (Doc. No. 4-2 at Ex. K, L.)  The Senate committee amended the bill in April 2012 to add an offense for the sale or the offer to sell "an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor."  (*Id.* at Ex. M.)  The amended bill unanimously passed both houses of the legislature in late April and early May, and was signed by the governor into law as Public Chapter 1075 on May 21, 2012.  (*Id.* at Ex. K)

The legislature held no public hearings on SB 2371 (*id.*; Doc. No. 31 at 12), which passed with no substantive debate and no discussion by legislators, apart from a suggestion by one senator that the state Attorney General verify the bill's constitutionality.  (Doc. Nos. 4 at 13; 4-2 at Ex. N; 39 at 4.)

The provision of the bill dealing with the sale of advertisements created a new offense codified at Tenn. Code Ann. § 39-13-314, which states:

> (a) A person commits the offense of advertising commercial sexual abuse of a minor if the person knowingly sells or offers to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act, as defined in § 39-13-301, with a minor.

8

(b)    (1) Advertising commercial sexual abuse of a minor is a Class C felony.
(2) In addition to any authorized period of incarceration, advertising commercial sexual abuse of a minor is punishable by a minimum fine of ten thousand dollars ($10,000).
(c) In a prosecution under this statute, it is not a defense that the defendant did not know the age of the minor depicted in the advertisement. It is a defense, which the defendant must prove by a preponderance of the evidence, that at the time of the offense, the defendant made a reasonable bona fide attempt to ascertain the true age of the minor appearing in the advertisement by requiring, prior to publication of the advertisement, production of a driver license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written allegations of the minor's age or the apparent age of the minor.

Tenn. Code Ann. § 39-13-314 (West 2012). Thus, the law makes the offense a Class C felony punishable by imprisonment and significant fines, and does not allow for a defense of ignorance of a minor's age. *Id.* The only affirmative defense available under the statute requires the seller, or potential seller, to examine governmental or student identification of the minor. *Id.*

The bill also added the following definitions to Tenn. Code Ann. § 39-13-301:

(14) "Advertisement" means a notice or an announcement in a public medium promoting a product, service, or event, or publicizing a job vacancy;
(15) "Commercial sex act" means any sexual act for which something of value is given or received;

Tenn. Code Ann. § 39-13-301 (West 2012).

The final Tennessee law mirrors the language of the original Washington bill from January 2012, except that it does not include a requirement that the sex act advertised "occur[] in this state" and does not require a depiction of a minor. (Doc. No. 4-2 at Ex. H.) Its affirmative defense section is the same. (*Id.*)

F. *Legislation and Action in Other States*

9

Connecticut also passed a law in 2012 regarding the online advertising of commercial sexual exploitation of children. (Doc. No. 4-2 at Ex. W.) Rejecting a bill similar to the Washington and Tennessee laws (Doc. No. 4 at 23), the Connecticut legislature chose not to impose liability on the publishers of advertisements, but to impose criminal liability on a person who "knowingly purchases advertising space for an advertisement for a commercial sex act that includes a depiction of a minor" (Doc. No. 4-2 at Ex. W).

Adopting a different tactic, the Attorney General of California announced in May 2012 an agreement with technology companies regarding their online privacy policies. (*Id.* at Ex. X.) The agreement came after she had invited the companies to join the state's human-trafficking task force. (*Id.*)

### G. Procedural History

On June 27, 2012, Backpage.com filed a Complaint against the Tennessee Attorney General and the state's thirty-one district attorneys (Doc. No. 1)—claiming section 39-13-314 is preempted by the federal Communications Decency Act and violates the First Amendment and Commerce Clause of the U.S. Constitution—and a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 2), seeking to enjoin the law from going into effect on July 1, 2012. On June 29, 2012, the Court held a hearing, after which Defendants stipulated to refrain from enforcing the law against Backpage.com or its corporate parents "during the pendency of this action." (Doc. Nos. 12; 13.) The parties filed multiple briefs: on June 27, 2012, Backpage.com filed a Memorandum in Support of its motion for injunctive relief (Doc. No. 4) with three attachments that included exhibits of news reports, copies of various state laws, copies of Backpage.com policies, and a declaration by one of its corporate officers (Doc. Nos. 4-1 to 4-3); on July 26, 2012, Defendants filed a Response to the Motion (Doc. No. 20), along with an

10

affidavit by TBI Agent Quin and multiple attachments (Doc. Nos. 21; 21-1 to 21-5); and Backpage.com then filed a Reply (Doc. No. 31) on August 21, 2012.

On August 29, 2012, the Court heard argument on the Motion. (Doc. No. 37.) On September 10, 2012, Defendants then filed a Supplemental Brief to address the preliminary injunction granted in *McKenna* and a recent Sixth Circuit opinion on standing in a First Amendment case. (Doc. No. 39.) Backpage.com then filed a Response to the Supplemental Brief on September 26, 2012. (Doc. No. 42.) On December 11, 2012, Backpage.com provided the Court with a copy of the stipulation and final order enjoining the Washington law. (Doc. No. 44.)

## II.    STANDING

As a preliminary matter, the Court first addresses Defendants' challenge to Backpage.com's standing to bring a pre-enforcement challenge to section 39-13-314. Defendants argue that Backpage.com "lacks standing because it does not offer proof of any concrete harm" and has only alleged "concerns of subjective chill" based on "a blanket, unsupported statement" that will face prosecution based on the statute's history and language. (Doc. No. 20 at 9.) Further, Defendants argue Backpage.com "has not alleged that it intends to violate the law" (Doc. No. 39 at 5) and has taken measures to screen illicit ads that show it "would be unlikely to face prosecution" (Doc. No. 20 at 10–11). Thus, they argue, "[t]here is nothing to show that any prosecution has been threatened, is imminent, or is even likely." (*Id.* at 10.) For its part, Backpage.com claims the law specifically targets the website and this "itself establishes standing." (Doc. No. 31 at 12.) Backpage.com cites evidence that Tennessee introduced a version of the Washington law targeting the website and followed a campaign by state attorneys general—including Defendant Cooper—demanding Backpage.com shut down its adult category. (*Id.* at 12.) In addition, Backpage.com notes that the state has not disavowed its

intent to prosecute and actively asserts that Backpage.com violates the law in its briefing before the Court. (*Id.*)

To litigate a case in federal court, a plaintiff must establish constitutional standing, which requires a showing that the plaintiff has suffered an injury-in-fact that is "fairly traceable to the defendant's allegedly unlawful conduct" and that is "likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007). A plaintiff satisfies the injury-in-fact requirement by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and "a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012).

In the First Amendment context, this means a plaintiff must allege a "specific present objective harm or a threat of specific future harm" that amounts to more than a "subjective chill," *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) (citation omitted), but "it is not necessary that [he] first expose himself to actual arrest or prosecution," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Further, the injury-in-fact requirement is automatically met, if "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988) (citations omitted).

Here, the Court finds Backpage.com has shown sufficient evidence that it is the direct target of the law, and would have to take cost-prohibitive measures to comply with its provisions. First, Defendants do not dispute that the Tennessee statute is a near-carbon-copy of an early draft of the Washington bill that "Washington legislators . . . openly stated . . . [was] aimed at Backpage.com." *McKenna*, 2012 WL 304543 at *6. Nor do they dispute that the

Tennessee legislature passed the bill after a several-year effort by Defendant Cooper and other state attorneys general—including the Washington Attorney General—to pressure Backpage.com to stop selling adult services advertisements. (Doc. No. 20 at 9–12.) In addition, Defendants' own witness, TBI Agent Quin, swore in an affidavit that the bill was effectively drafted to "prohibit" paid advertising of child sex trafficking, of which Backpage.com was known to be the primary source. According to Agent Quin, who claimed to be "familiar with the reason" the bill was enacted, "[m]embers of the Legislature were advised that if paid advertising of such commercial exploitation of children was prohibited, it would . . . have a disruptive effect on the child sex trade." (Doc. 21 ¶ 17.) Agent Quin also asserted that "[t]he internet has become a favored means of advertising the availability of children for sex" and that, after October 2010, Backpage.com was known to be the largest provider of online advertisements for sex services. (Doc. No. 21 ¶¶ 10–11.) By contrast, she asserted the bill "was not intended to punish operators of web sites that host chat rooms, free advertising, free bulletin boards or anything other than the knowing sale of a prohibited advertisement." (*Id.* ¶ 18.)

Second, the Court finds the website would have to undergo significant changes to comply with and to avoid liability under the law. As a result of the law's breadth, Backpage.com alleges that it would have to undertake an individual review of the millions of ads posted on its site each month and likely conduct in-person identification checks of users, which it calls "a practical impossibility." (Doc. No. 4-3 ¶¶ 4, 17–21.) Backpage.com does not currently screen every advertisement on its website (*Id.* ¶ 13), and does not have an offline physical presence in Tennessee (*Id.* ¶ 20). Thus, though the record does not contain the on-the-record, "gotcha" statements made by legislators in *McKenna* that directly tied the Washington law to a campaign to shut down Backpage.com sex ads there, this Court finds there is enough evidence to support

13

Backpage.com's claim that it was the target of Tennessee's law that imposes significant costs to comply.

Even if the statute did not directly target Backpage.com, however, the Court finds Backpage.com has nonetheless alleged sufficient facts to establish a credible threat of prosecution under *Babbitt*. First, Backpage.com has made clear it intends to continue hosting adult and escort services advertisements, which it argues may be proscribed by the statute's vague and overbroad scope. (Doc. No. 4 at 11, 25–29.) Second, the Court cannot ignore the state's thinly veiled threat to enforce the law against Backpage.com. Defendants assert in their briefs and supporting documents that Backpage.com has hosted and continues to host paid advertisements that violate the law. (Doc. No. 20 at 32 (stating Backpage.com "wishes to continue making money selling advertisements that would appear to a reasonable person to be for the purpose of engaging in a commercial sex act with a minor").) Defendants included more than one dozen such advertisements as exhibits in their Response to the Motion (Doc. Nos. 21-1; 21-2), and TBI Agent Quin swore that she surveys Backpage.com's website regularly in the course of investigations (Doc. No. 21 ¶ 13). In addition, Defendants claim that "commercial sex trafficking of children is a serious problem in Tennessee" (Doc. No. 20 at 3) and have not stated they would keep sheathed the state's newest tool to address the problem. *See Am. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").

Defendant nonetheless relies on *Morrison v. Board of Education of Boyd County*, 521 F.3d 602 (6th Cir. 2008), to argue that Backpage.com has alleged only a "subjective chill" of speech that does not amount to a sufficient injury-in-fact for standing. (Doc. No. 20 at 9.) The Court finds the comparison inapt. In *Morrison*, a student claimed his First Amendment rights were chilled when his school district—acting under a consent decree—created a

14

harassment/discrimination policy that prohibited anti-homosexual bullying in schools. 521 F.3d at 605–07. Because the policy carved out constitutionally protected speech and the record was "silent" as to any threats to punish Morrison, the Sixth Circuit concluded that his fears were based on "his own 'subjective apprehension and a personal (self-imposed) unwillingness to communicate'" that, "without more," were too speculative. *Id.* at 610 (quoting *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 662 (6th Cir. 2007)). As stated above, Backpage.com has shown the "more" *Morrison* requires, in the form of statements by Defendants that Backpage.com is violating the law, sworn statements by Agent Quin, and at least one letter from Defendant Cooper to Backpage.com stating "that ads for prostitution—including ads trafficking children—are rampant on the site" (Doc. No. 4-2 at Ex. E). *See Berry*, 688 F.3d at 297 (warning letter from a state bar association that a lawyer violated the rules of conduct and should avoid such conduct in the future "implied a threat of future enforcement that elevated the injury from subjective chill to actual injury").

Lastly, Defendants' reliance on the Sixth Circuit's recent decision in *Glenn v. Holder*, 690 F.3d 417 (6th Cir. 2012), for the proposition that Backpage.com must "show it intends to violate [section] 39-13-24" is unconvincing. (Doc. No. 39 at 5.) In *Glenn*, the court held a group of religious leaders—who espoused anti-homosexual beliefs, but explicitly denounced violence—lacked standing to challenge the federal Hate Crimes Act because they did not allege the intent to "willfully cause bodily injury" to others required for liability. *Id.* at 421–23. The court held the Hate Crimes Act expressly did not criminalize the protected speech the plaintiffs intended to engage in, and the plaintiffs "can't quite pinpoint what it is they want to say that could subject them to prosecution." *Id.* at 422. As discussed above, the facts of the threat here stand in sharp contrast to *Glenn*, both based on Backpage.com's stated intention and Defendants' characterization of Backpage.com's actions. In addition, *Glenn* does not require that

15

Backpage.com state an intent to sell advertisements that actually involve child prostitution, as Defendants suggest.  (Doc. 39 at 5.)  *Glenn* relied on the *Babbitt* standard that requires a plaintiff allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," 690 F.3d at 421 (citations omitted), which here involves continuing to sell space on its website for adult advertisements that Backpage.com—and Defendants—believes fall under the statute.

Thus, the Court finds that Backpage.com has standing to bring this challenge.

## III.  LEGAL STANDARD

Backpage.com seeks a preliminary injunction against section 39-13-314.  (Doc. Nos. 4; 31 at 9 n.1.)  Courts consider four factors when deciding whether to grant a preliminary injunction under Federal Rule of Civil Procedure 65: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (citation omitted). In cases implicating the First Amendment, the first factor is often determinative.  *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).  This factor is critical because "the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action]." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000).  That is, "'when First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.'"  *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002).

# IV.   ANALYSIS

## A.  Likelihood of Success on the Merits

Backpage.com makes six claims: (1) section 39-13-314 is preempted by the federal Communications Decency Act of 1996 ("CDA"), which grants immunity to online publishers; (2) it violates the First Amendment because it does not contain sufficient scienter; (3) it violates the First Amendment because it is unconstitutionally vague; (4) it violates the First Amendment because it is unconstitutionally overbroad; (5) it violates the First Amendment because it is not narrowly tailored; and (6) it violates the Commerce Clause.  (Doc. No. 4.)

### i.   Communications Decency Act

Backpage.com first argues that section 39-13-314 is preempted by the CDA because section 230 of the CDA prohibits state laws from imposing liability on interactive computer services for third-party content, even if the content is unlawful and the website had reason to know of the unlawfulness.  (Doc. No. 4 at 16–20.)  Backpage.com argues that, by holding websites criminally liable for selling certain advertisements, section 39-13-314 runs afoul of the CDA's "broad federal immunity" and conflicts with section 230's goal of protecting Internet freedom.  (Doc. No. 4 at 17–19.)  Defendants offer a gestalt of arguments for why the CDA does not invalidate section 39-13-314: (1) the state law is consistent with the CDA and therefore not preempted by it; (2) the CDA applies only to Internet regulations, but the state law covers all media; (3) CDA immunity is an affirmative defense, but does not provide total immunity from suit; (4) CDA immunity does not apply because the state law regulates conduct, not speech, and therefore does not treat websites as "publishers" of information; and (5) the state law is "identical in effect to the federal sex law whose enforcement is not impaired by the CDA." (Doc. No. 20 at 12–17.)

17

When Congress passed the CDA, which broadly governs accessibility of obscene materials online, it included a provision that "overrides the traditional treatment of publishers, distributors, and speakers under statutory and common law," *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003), and "protects certain internet-based actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009). The Sixth Circuit has not yet considered the scope of immunity under this provision, section 230. *See Doe v. SexSearch.com*, 551 F.3d 412, 415 (6th Cir. 2008). However, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)); s*ee also Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000); *Green v. Am. Online, Inc.*, 318 F.3d 465 (3d Cir. 2003); *Batzel*, 333 F.3d 1018; *Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *Johnson v. Arden*, 614 F.3d 785, 791–92 (8th Cir. 2010). That is, "[c]ourts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699–700 (S.D.N.Y. 2009).[1]

In evaluating section 230's scope as it relates to section 39-13-314, two sub-sections are relevant. The sub-section titled "Protection for 'Good Samaritan' blocking and screening of offensive material" states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (2012). In addition,

---

[1] Even recent Seventh and Ninth Circuit decisions that have shied from the label "immunity" to describe section 230's effect, have narrowed their interpretation of section 230 only to clarify that it applies when an interactive computer service provider acts as a publisher for third-party content—and not against liability over content it has created or is responsible for. *See, e.g., Fair Hous. Council of San Fernando*, 521 F.3d 1157, 1162–63 (9th Cir. 2008); *Barnes*, 570 F.3d at 1102; *Chicago's Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669–71 (7th Cir. 2008). Thus, if a state treats an interactive computer service provider as a "publisher or speaker," then simply "section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102.

> [n]o provider or user of an interactive computer service shall be
> held liable on account of—any action voluntarily taken in good
> faith to restrict access to or availability of material that the
> provider or user considers to be obscene, lewd, lascivious, filthy,
> excessively violent, harassing, or otherwise objectionable, whether
> or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A) (2012).  Further, the sub-section titled "Effect on other laws" states that

"[n]othing in this section shall be construed to prevent any State from enforcing any State law

that is consistent with this section.  No cause of action may be brought and no liability may be

imposed under any State or local law that is inconsistent with this section."  47 U.S.C. §

230(e)(3) (2012).

Congress has the power to preempt a state law in three ways.  First, "Congress may

withdraw specified powers from the States by enacting a statute containing an express

preemption provision."  *Ariz. v. United States*, 132 S. Ct. 2492, 2500–01 (2012).  Second, "the

States are precluded from regulating conduct in a field that Congress, acting within its proper

authority, has determined must be regulated by its exclusive governance.  *Id.* at 2501.  Third,

"state laws are preempted when they conflict with federal law."  *Id.* (citing *Crosby v. Nat'l*

*Foreign Trade Council*, 530 U.S. 363, 372 (2000)).  Conflict preemption "includes cases where

'compliance with both federal and state regulations is a physical impossibility,' and those

instances where the challenged state law 'stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress.'"  *Id.* (quoting *Fla. Lime & Avocado*

*Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67

(1941)).

a. Express Preemption

First, the Court finds section 39-13-314 is likely expressly preempted by CDA section

230(e)(3), which unequivocally states that "no liability may be imposed under any State or local

19

law that is inconsistent with this section."  47 U.S.C. §230(e)(3).  The state statute is likely

inconsistent with the CDA because, while section 230 prohibits laws from treating interactive

computer service providers as the "publishers or speakers" of third-party content, the state law

nonetheless imposes liability on websites such as Backpage.com for selling or offering to sell

advertisements, activity inherent in their role as publishers.  *See* 47 U.S.C. § 230(c)(1).[2]

Backpage.com is the quintessential publisher contemplated by the CDA: it hosts and maintains

an ongoing forum for user-generated postings—some paid, others free—that it shares with the

public at large.

     Nonetheless, Defendants argue section 39-13-314 is consistent with CDA section 230

because the state law regulates conduct—the sale of advertisements—and not the speech itself,

and therefore does not treat websites as "publishers or speakers."  (Doc. No. 20 at 15–17.)

     However, the question of whether a state law treats an interactive computer services

provider as a publisher is whether liability "derives from the defendant's *status or conduct* as a

'publisher or speaker.'"  *Barnes*, 570 F.3d at 1102 (emphasis added).  In *Barnes*, a plaintiff

brought a state negligence claim against a website for its failure to remove offensive postings

that one of its employees told the plaintiff the website would remove.  In determining that the

negligence action relied on treating the website as a publisher, the Ninth Circuit explained "that

publication involves reviewing, editing, and deciding whether to publish or withdraw from

publication third-party content."  *Id.* at 1102 (citation omitted).  Because "removing content is

something publishers do, . . . to impose liability on the basis of such conduct necessarily involves

treating the liable party as a publisher of the content it failed to remove."  *Id.* at 1103.

     Similarly here, this Court finds that the sale of online advertisements regulated by section

39-13-314 derives from a website's status and conduct as an online publisher of classified

---

[2] The parties do not dispute that Backpage.com is an interactive computer services provider, as defined by section 230.

advertisements.  In the realm of paid advertising, charging advertisers a fee in exchange for hosting and providing space for the advertisers' message "is something publishers do"—online classified advertisement services included.  Put another way, the transaction of the sale is inherent in the classified service's conduct as a publisher; this Court cannot separate the sale from the publishing, and thus the protection of section 230 is triggered.[3]

   b.   Conflict Preemption

   In addition, the Court finds section 39-13-314 likely conflicts with the CDA because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines*, 312 U.S. at 67.  The seminal section 230 cases have concluded that Congress created section 230 immunity for two reasons: "to encourage the unfettered and unregulated development of free speech on the Internet," and "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material, so as to aid parents in limiting their children's access to such material."  *Batzel*, 333 F.3d at 1027–28.  In passing the law, Congress recognized that, given the "staggering" amount of information communicated online:

> [t]he specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

---

[3] Defendants' reliance on *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010), to differentiate conduct from speech is also unconvincing.  In *StubHub!*, the Seventh Circuit rejected in summary fashion a ticket resale website's attempt to use section 230 to shield it from a municipal ordinance requiring sales agents to collect a local amusement tax on all ticket resales in the city.  *Id.* at 365–66.  The website hosted auctions between users selling tickets and those buying tickets, and in processing the sales, collected commission from the parties but not taxes.  *Id.* at 364.  The court concluded section 230 was "irrelevant" because the effort to collect taxes did "not depend on who 'publishes' information or is a 'speaker.'"  *Id.* at 366.  In essence, the tax ordinance applied to the website not for its conduct as a publisher of ticket-sale advertisements, but for its conduct as a sales agent processing ticket transactions.  As Plaintiff properly asserts, "[t]he court did not draw any distinction between conduct and speech, as Defendants contend." (Doc. No. 31 at 19–20 n.9.)

*Zeran*, 129 F.3d at 331.

Here, the Court finds the state statute would likely undermine both goals supporting CDA immunity because it would encourage websites either to restrict speech or to relax their current self-policing. First, rather than encouraging unfettered speech, the law imposes significant penalties for certain ads that would create the need for the undesirable screens envisioned by the *Zeran* court. It's not hard to see how. The law would impose potential incarceration and a fine of at least $10,000 for each violation of the statute. Tenn. Code Ann. § 39-13-314(2). For an online classified service such as Backpage.com, preventing liability could amount to screening millions of advertisements because the only defense available under the law requires a defendant to prove that he "made a reasonable bona fide attempt to ascertain the true age of the minor" by obtaining "production of a driver [sic] license, marriage license, birth certificate, or other governmental or educational identification card." Tenn. Code Ann. § 39-13-314(c). And, because the defendant may "not rely solely on oral or written allegations of the minor's age," *id.*, the Court finds the law likely requires some type of in-person identification verification. (Doc. No. 4-3 ¶ 20.) Backpage.com argues that this in-person screening is a "practical impossibility" for itself and "innumerable other online service providers with no physical location in Tennessee, much less every city, town and state where users can access the Internet." (*Id.* ¶¶ 4, 20.) As a result, the Court finds that some online publishers will likely be forced to eliminate user postings alluding to sexual topics, rather than face possible liability, which "would eliminate vast amounts of permissible adult-oriented speech." (*Id.* ¶ 9.)

The law also likely undermines Congress's goal of encouraging self-policing, which in the online sex trafficking context involves monitoring postings and reporting information on potential sex traffickers to law enforcement. Backpage.com now voluntarily engages in an

automated screening and "two-tier manual (human) review" of nearly all postings in its adult and dating categories, and reports suspicious postings to the NCMEC. (Doc. No. 4-3 ¶¶ 13–14.) It states that credit card information gathered from users for posting ads in these categories "help identify and track users engaged in illegal posting or activity." (*Id.* at ¶ 6.) Because the state law imposes no liability for hosting free advertisements (Doc. No. 21 ¶ 18)—which can still generate ad revenue based on traffic to the website (Doc. No. 4-2 at Ex. T)—and punishes websites $10,000 at a time for "knowingly" selling offensive ads, the Court finds section 39-13-314 also will likely encourage some websites to stop charging for "adult" advertisements. As a result, they will stop collecting credit card data useful to tracking sex traffickers, and relax their review process. *See Zeran*, 129 F.3d at 333. The Court finds this result is directly at odds with the second of the CDA's twin goals.

Defendants argue the law does not conflict with these goals because "the CDA was enacted to protect minors from obscene material on the internet" while protecting free speech, and the state law also "protects minors" because it "punish[es] only the conduct that endangers minors." (Doc. No. 20 at 16–17.) The Court finds this linking of two unrelated sets of minors has no support and is unlikely to succeed: The CDA was meant to protect minors who surf the Internet from exposure to obscene materials; the state presents no evidence that these are the same minors who would be the victims of sex trafficking protected by section 39-13-314.

Defendants also argue that the law does not conflict with the CDA because it is "*identical in effect* to the federal sex trafficking law whose enforcement is not impaired by the CDA," citing to 18 U.S.C. § 1591.[4] (Doc. No. 20 at 17 (emphasis added).) To support this, Defendants

---

[4] The federal sex trafficking statute punishes anyone who knowingly

(1) . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

interpret *McKenna* to state that "criminalizing profiting from sex trafficking a minor is a regulation on conduct, not speech" and to conclude that "*McKenna*'s discussion of 18 U.S.C. § 1591 demonstrates that, under federal law, Backpage could currently be prosecuted for such conduct." (Doc. No. 39 at 7.) These conclusions stretch beyond credibility. The state law at issue here is not identical in effect to the federal law, as section 39-13-314 would criminalize a swath of activity not reached by 18 U.S.C. § 1591. The federal law requires that a person benefited from participation in sex trafficking and that he *knew or recklessly disregarded* that the child trafficked was a minor and was "caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). By contrast, the state law specifically states that lack of knowledge of a minor's age is no defense and would criminalize an "offer" to sell advertisements, which could hardly amount to a "benefit" from participation in sex trafficking under the federal law. Tenn. Code Ann. § 39-13-314(a),(c). Because the state and federal statutes are not identical in effect, *McKenna*'s statement that the federal law regulates conduct only does not lead to the conclusion that section 39-13-314 also regulates conduct only. As Backpage.com effectively argues, the treatment of advertisements as speech is supported by Supreme Court and Sixth Circuit precedent that discusses the interconnectedness of the sale of advertisements and speech. *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011); *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012).

Defendants further argue that "the CDA cannot be asserted in a facial challenge as immunity from suit" because it can be used only as a defense to liability. (Doc. No. 20 at 14.)

---

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.

18 U.S.C. § 1591(a) (2012).

24

For this, they cite a decision from this Court, *Energy Automation Sys., Inc. v. Xcentric Ventures, LLC*, No. 3:06-1079, 2007 WL 1557202 (M.D. Tenn. May 25, 2007), in which the Court rejected a website's argument that section 230 barred the Court from exercising personal jurisdiction. Noting that "the CDA has created a broad defense to liability," the Court held that "[w]hether or not that defense applies in any particular case is a question of the merits of the case, and not to the question of jurisdiction." *Id.* at *13. However, the Court does not find this isolated statement relevant to the current issue of preemption. Personal jurisdiction deals with a court's authority to hear a case, not the state legislature's power to enact a statute that conflicts with federal law.

c. Facial/As Applied Challenge

Lastly, Defendants argue Backpage.com has not met its burden to invalidate the state law by a facial challenge. Relying on *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010), Defendants argue that Backpage.com must show that "no set of circumstances exists under which § 39-13-314 would be valid," a burden it cannot meet because CDA preemption would not prevent non-Internet enforcement of the law. (Doc. No. 20 at 14.) By contrast, Backpage.com asserts that its challenge is both facial and as applied to its website, and disputes the standard Defendants seek to apply for facial challenges. (Doc. No. 31 at 15.) The Court's findings immediately above establish Backpage.com's likely success in its challenge to the law, as applied to Internet advertisements.

As to the facial challenge, as with the *McKenna* Court, this Court questions the applicability of the "no set of circumstances" standard that originates from *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See McKenna*, 2012 WL 3064543 at *10. First, both the Supreme Court and Sixth Circuit have recognized that the Supreme Court has failed to adopt this articulation of the facial challenge standard on a consistent basis. *See Stevens*, 130 S. Ct. at 1587

25

("Which standard applies . . . is a matter of dispute"); *City of Chi. v. Morales*, 527 U.S. 41, 55 n.22 (1999) ("To the extent that we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself."); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (holding courts "generally insist that the claimant show . . . that there truly are 'no' or at least 'few circumstances'") (citing *Salerno*, 481 U.S. at 745); *Simon v. Cook*, 261 F. App'x 873, 883 (6th Cir. 2008) (noting criticism of "inconsistent" precedent in the Sixth Circuit on the standard for facial challenges outside the First Amendment and abortion); *United States v. Ariz.*, 641 F.3d 339, 345 n.3 (9th Cir. 2011) (noting post-*Salerno* Supreme Court cases that do not apply the "no set of circumstances" standard), *aff'd*, *Ariz. v. United States*, 132 S. Ct. 2492 (not applying *Salerno*).

In addition, *Stevens* itself made clear that, in the First Amendment context, a facial challenge against a state law will prevail "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" 130 S. Ct. at 1587 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008); *but see Green Party of Tenn. v. Hargett*, No. 12-5271, 2012 WL 5974189, at *9 (6th Cir. Nov. 30, 2012) (applying the *Salerno* standard in a First Amendment facial challenge to a state's ordering of candidates on ballots). Backpage.com argues that the First Amendment standard articulated by *Stevens* should apply here, as its "rationale applies equally to challenges under section 230, which is Congress's embodiment of the First Amendment on the Internet," citing *Batzel*, 333 F.3d at 1028. (Doc. No. 31 at 14 n.5.)

Whether the "no set of circumstances" test or the "substantial number of applications" standard applies to a facial challenge under the CDA, this Court finds persuasive *McKenna*'s reasoning that the "Defendants' ability to point to a non-preempted application of the law is not

26

dispositive" under *Salerno*. 2012 WL 3064543 at *10. *McKenna* relied on the Ninth Circuit's rationale that the question under *Salerno* is not "whether state . . . officials can *apply* the statute in a constitutional way," which wrongly assumes a statute "is not preempted on its face, and then points out allegedly permissible applications of it." 2012 WL 3064543 at *10 (quoting *United States v. Ariz.*, 641 F.3d at 346). Rather, "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause." *United States v. Ariz.*, 641 F.3d at 346. As discussed above, this Court finds the state law conflicts with Congress's intent in enacting CDA section 230 because it imposes liability on websites acting as publishers of third-party information and creates a regime that will likely restrict speech and undermine self-policing that already occurs online. As such, it cannot survive Backpage.com's facial challenge.

Thus, the Court finds section 39-13-314 likely is preempted by the CDA and therefore invalid, both facially and as applied to online advertising services, such as Backpage.com.

ii.  First Amendment

a.  Scienter

Backpage.com next argues that the state law violates the First Amendment because it does not contain an element of scienter regarding the age of the minors featured in the advertisement. (Doc. No. 4 at 20–22.) Defendants respond that this is not a constitutional requirement and, even if it were, the state law contains sufficient scienter. (Doc. No. 20 at 18.) The Court begins by interpreting the statute and then applying the constitutional requirements.

In interpreting state laws of first impression, "we are guided by applicable principles of state law and by relevant decisions of other jurisdictions." *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1249 (6th Cir. 1984) (citation omitted). When interpreting a statute, Tennessee courts "must ascertain and give effect to the legislative intent without restricting or expanding

27

the statute's intended meaning." *Garrison v. Bickford*, 377 S.W.3d 659, 663 (Tenn. 2012) (citing *U.S. Bank, NA v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009)). To do so, a court first examines the text of the statute and, if the language used is unambiguous, applies the plain meaning of the words in the statute. *Id.* The court "must (1) give these words their natural and ordinary meaning, (2) consider them in the context of the entire statute, and (3) presume that the General Assembly intended to give each of these words its full effect." *In re Estate of Trigg*, 368 S.W.3d 483, 490 (Tenn. 2012). "Every word in a statute is presumed to have meaning and purpose." *Garrison*, S.W.3d at 663 (citing *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 698, 694 (Tenn. 2011)). If, after examining the text of the statute, it is still ambiguous, the court "may reference the broader statutory scheme, the history of the legislation, or other sources to discern its meaning." *Highwoods Props., Inc v. City of Memphis*, 297 S.W.3d 695, 701 (Tenn. 2009).

Lastly, "[i]t has long been a tenet of First Amendment law that, in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Am. Booksellers Ass'n*, 484 U.S. at 397 (citations omitted). However, "[t]he key to application of this principle is that the statute must be 'readily susceptible' to the limitation" because a court "will not rewrite a state law to conform it to constitutional requirements." *Id.*

Here, the primary provision of section 39-13-314 states that "[a] person commits the offense of advertising commercial sexual abuse of a minor if the person knowingly sells or offers to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor." Tenn. Code Ann. § 39-13-314(a). Backpage.com reads the provision so that "knowingly" applies only to the sale or offer, leaving it devoid of a scienter requirement relating to the minor's age. Defendants argue scienter

28

exists because the provision "require[s] that a person knowingly publish an advertisement that depicts a minor and that a reasonable person would know that such advertisement depicts a minor." (Doc. No. 20 at 18.) Defendants do not claim the statute requires knowledge of a minor's actual age.

The Court reads the statute's element of scienter similarly to Defendants. A natural reading of the statute indicates that the adverb "knowingly" modifies the verbs that immediately follow it—"sells or offers to sell"—and the attached clause describes the content of the advertisements the person knowingly sold. That is, the Court finds the law requires a person know that the advertisement he sells (or offers to sell) would *appear* to promote a commercial sex act with a minor. The Court finds the law requires no actual knowledge of the age of anyone featured in the advertisement—nor does it require that the person featured *be* a minor—but attaches liability if a person knows that the advertisement gives off the appearance of underage sex for sale.[5] Context supports this reading. The subsequent affirmative defense provision confirms that no actual knowledge of the person's age is necessary, stating that "it is not a defense that the defendant did not know the age of the minor depicted." Tenn. Code Ann. § 39-13-314(c). In other words, lack of knowledge of the minor's actual age is no defense to liability under the law because it is not a requirement to begin with.

Thus, the issue here is whether this level of scienter meets constitutional scrutiny. Backpage.com argues actual knowledge of a child's age is required by Supreme Court precedent in child obscenity cases (Doc. No. 4 at 20–22), while Defendants argue that reasoning of these cases comes out in their favor (Doc. No. 20 at 17–22).

---

[5] In addition, contrary to Defendants' assertions, section 39-13-314 does not require an advertisement to "depict" a minor. *See* Tenn. Code Ann. § 39-13-314 (requiring simply that the ad "appear . . . to be for the purpose of engaging in what would be a commercial sex act . . . with a minor").

29

In fleshing out the contours of constitutionality, the Supreme Court has not drawn a fixed line in the sand regarding what scienter element is required under the First Amendment, but has looked to the principles of First Amendment law and parsed a statute's potential effects. In *Smith v. California*, the Court held that a local ordinance imposing criminal sanctions on the selling of obscene books must require the seller to have some knowledge of the books' contents. 361 U.S. 147 (1959). Otherwise, "he will tend to restrict the books he sells" and the law "may tend to work a substantial restriction on the freedom of speech and the press." *Id.* at 153, 150. The Court elaborated on this risk of chill in another obscenity case, *Mishkin v. State of New York*, holding that "[t]he Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." 383 U.S. 502, 511 (1966). While the *Mishkin* Court declined to set a firm rule on what scienter was required under *Smith*, it noted that the New York Court of Appeals had interpreted the state obscenity statute at issue in the case to require defendants were "in some manner aware of the character of the material they attempt to distribute," such that the punished behavior was a "calculated purveyance of filth" and not innocent behavior. *Id.* at 510–11. Without elaboration, the Court found this "definition of the scienter required . . . amply serves those ends, and therefore fully meets the demands of the Constitution." *Id.* at 511.

In its most recent decision discussing the scienter requirements in criminal child obscenity laws, the Court interpreted a federal law prohibiting the distribution and reproduction of visual depictions of minors engaged in sexually explicit acts to require knowledge of the minor's age. *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994). Simply citing a string of its past cases—including *Smith* and *Mishkin*—the Court in *X-Citement Video* concluded "that a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts." *Id.* at 78.

Here, based on the principles discussed in *Mishkin*, this Court believes that the *X-Citement Video* Court's conclusion likely applies equally to the regulation of advertisements for sex acts with minors, and therefore the statute is likely constitutionally deficient. *See McKenna*, 2012 WL 3064543 at *13. On one hand, Backpage.com has painted a clear picture of the hazards of self-censorship if this is the case: websites such as Backpage.com will bear an impossible burden to review all of their millions of postings or, more likely, shut down their adult services section entirely (Doc. No. 4-3 ¶ 18–21); in addition, many users would likely refrain from posting constitutionally permissible advertisements, rather than produce identification (*id.* ¶ 19). At the same time, the law's knowledge requirement—that an advertisement "would appear to the reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor," Tenn. Code Ann. § 39-13-314(a)—does not sufficiently compensate for the ambiguity inherent in the statute, which has several undefined terms and broad definitions governing its scope, as discussed fully in the vagueness and overbreadth sections below. In particular, because the law does not require a depiction of the person alleged to be a minor, this Court finds particular concern in the indefiniteness of a "reasonable person" standard. In other words, requiring knowledge of what a reasonable person would believe might only add a layer of abstraction to an already vague statute.

Nonetheless, Defendants argue *X-Citement Video*'s reasoning would not impose knowledge of a minor's age under section 39-13-314 because the Supreme Court in *X-Citement Video* required knowledge of a minor's age only because the criminality of the conduct relied specifically on age. (Doc. No. 20 at 21.) That is, whereas the government could criminalize sexually explicit, but not obscene, materials involving children, it could not regulate the same materials featuring adults. Because prostitution involving subjects of any age is illegal in

Tennessee, Defendants argue that a minor's age is not an essential element differentiating innocent and guilty conduct that requires scienter in section 39-13-314. (Doc. No. 20 at 22.)

This Court disagrees. While prostitution may be illegal in Tennessee, the statute at issue here does not criminalize prostitution—it criminalizes the sale or potential sale of advertisements. Defendants have made no showing that an adult analogue to Tenn. Code Ann. § 39-13-314 exists and is constitutional, rendering it illegal to sell or offer to sell advertisements in Tennessee that appear to encourage a commercial sex act with an adult. It appears to the Court that Defendants are trying, on one hand, to take advantage of lowered First Amendment standards relating to child safety and obscenity in order to regulate speech, while, on the other hand, claiming now to regulate an activity that affects both adults and minors alike. They cannot have it both ways.

Thus, the Court finds section 39-13-314 likely violates the First Amendment's scienter requirement.

b. Overbreadth

Backpage.com also argues section 39-13-314 violates the First Amendment because it is overbroad. (Doc. No. 4 at 25–28.) The law sweeps within its ambit lawful content outside of the state's interest in preventing sexual exploitation of minors, Backpage.com argues, because it does not require minors to appear in advertisements and because of its expansive definition of "commercial sex act." (*Id.*) In response, Defendants argue that overbreadth cannot be used to invalidate section 39-13-314 because the overbreadth doctrine does not apply to commercial speech, in particular commercial speech promoting illegal activity. (Doc. No. 20 at 27–28.)

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "A law is overbroad under the First Amendment if it 'reaches a

32

substantial number of impermissible applications' relative to the law's legitimate sweep." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 387 (6th Cir. 2001) (citing *New York v. Ferber*, 458 U.S. 747, 771 (1982)). "Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down." *Id.* at 387.

In the context of regulating child pornography, for instance, the Supreme Court has stated that restrictions on expressive materials must be "'intrinsically related' to the sexual abuse of children" to avoid concerns of overbreadth. *Free Speech Coalition*, 535 U.S. at 250 (holding a provision of federal child pornography law overbroad because the child-protection rationale for speech restrictions does not apply to materials produced without children) (citing *Ferber*, 458 U.S. at 759). Yet, "'[b]ecause of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment," the Court has "recognized that the overbreadth doctrine is 'strong medicine'" to be employed "with hesitation, and then 'only as a last resort.'" *Ferber*, 458 U.S. at 769 (quoting *Broadrick v. Okla.*, 413 U.S. 601, 613 (1973)).

Here, the Court finds the state law is likely substantially broader than required for its regulatory purpose to protect the health and safety of minors trafficked in Tennessee, and would likely include constitutionally protected speech. First, the statute would impose liability even if an advertisement did not involve actual minors or sexual acts with minors. Under the law, a person risks incurring criminal penalties for selling, or offering to sell, notices or announcements "that would *appear* to a reasonable person to be for the purpose of engaging in *what would be* a commercial sex act . . . with a minor." Tenn. Code Ann. § 39-13-314(a) (emphasis added). Because there is no requirement in this definition that the advertisement actually involve a minor or even a sexual act—only that the notice "appear" to advertise a sexual act with a minor—the

33

law could impose liability for advertisements, notices, announcements and online postings that do not involve minors at all, or that appear suggestive without actually involving a paid-for sexual act. For instance, a description on a Backpage.com posting for escort services with someone who is "barely legal" would fall under the sweep of the statute, even though posted by a twenty-five year-old. The statute might also apply to a personal ad by the same twenty-five year-old on a paid dating website that is purposefully coy and playful, but has no connection to prostitution, much less child sex trafficking.

By contrast, as discussed above, the Court does not find convincing Defendants' attempt to redraft the statute's definition to include a "require[ment] that an actual minor be depicted in the advertisement," based on the language of the affirmative defense provision that follows the definition of the offense at section 39-13-314(a). (Doc. No. 20 at 23.) This subsequent provision states "it is not a defense that that defendant did not know the age of the minor depicted in the advertisement," and it is a defense that "the defendant made a reasonable bona fide attempt to ascertain the true age of the minor appearing in the advertisement." Tenn. Code Ann. § 39-13-314(c). This language is at odds with section 39-13-314(a), which makes no mention a "depiction" and does not require that anyone "appear" in the advertisement. A plain language reading of the statute does not allow an odd-fitting defense provision to add a requirement to the offense.[6] In addition, Defendants have shown no evidence of legislative intent or history to support this rewriting of the offense. If anything, the only evidence in the record to shine light on this discrepancy is that the original Washington bill—introduced several months before the advertising offense was added to the Tennessee bill—contained an explicit requirement that an

---

[6] Defendants' argument cuts both ways for their position. If their reading were correct, the Court could likely find an additional ground for Plaintiff's void-for-vagueness claim, as the conflicting provisions would create two standards that do not give a person of average intelligence fair warning of the elements of the conduct proscribed by the statute. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997) (holding a "difference in [statutory] language will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean").

34

advertisement contain a depiction of an actual minor. (Doc. No. 4-2 at Ex. H.) This requirement was not included in the Tennessee bill, which adopted the same affirmative defense provision as Washington's bill. (*Id.* at Ex. M.)

Second, the Court finds the definition of "commercial sex act" as "any sexual act for which something of value is given or received," Tenn. Code Ann. § 39-13-301, is likely overbroad, as it would include substantial activity unrelated to sex trafficking. As the *McKenna* court noted: "Assuming the undefined term 'something of value' means anything that can be traded on the free market—including a bottle of wine, a nice dinner, or a promise to do the dishes—[the law's] definition of 'commercial sex act' encompasses vast swaths of legal, consensual, non-commercial sexual activity." *McKenna*, 2012 WL3064543 at *16. As Backpage.com convincingly argues, a commercial sex act—as written in the statute—could also include "pay-per-view sexual content or a live chat of sexual nature." (Doc. No. 4 at 26.) Defendants do not argue that any of these activities has any connection to the sex trafficking of minors in Tennessee. Yet, because section 39-13-314 would potentially leave publishers on the hook for "offering" to sell advertisements related to these and other suggestive activities, publishers will likely remove potentially offending yet legal postings, effectively chilling speech. Thus, "[b]ecause this definition could apply to a range of expression that does not cause the secondary effects that the [law] was aimed to prevent, it is overbroad." *Deja Vu*, 274 F.3d at 388.

Nonetheless, Defendants argue the statute is not overbroad because it regulates only commercial speech, and the "overbreadth doctrine does not apply to commercial speech" under *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982). (Doc. No. 20 at 28.) "Although it is true that overbreadth analysis does not normally apply to commercial speech," the overbreadth doctrine will still apply to a statute that "reach[es] some noncommercial

35

speech." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 481–82 (1989).

Despite section 39-13-314's use of the words "commercial" and "advertisement," the Court finds

the scope of the statute encompasses both commercial and noncommercial speech. The Supreme

Court has defined "commercial speech" alternatively as "expression related solely to the

economic interests of the speaker and its audience," and as "speech proposing a commercial

transaction." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 493 (1995) (Stevens, J., concurring)

(citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561–

62 (1980)). As discussed above, this Court finds the sweep of the statute likely includes speech

such as paid personal ads that do not propose a purely commercial transaction or relate solely to

the economic interests of the speaker or audience. *See McKenna*, 2012 WL3064543 at *16. As

a result, the overbreadth doctrine applies.

Thus, for the reasons above, the Court finds the law is likely substantially overbroad and

invalid on its face.

    c.  Vagueness

Backpage.com also argues the section 39-13-314 violates the First Amendment because it

is void for vagueness. The website contends the law's "key term, 'commercial sex act,' is too

vague to provide a reasonable opportunity to know what is prohibited" because its only

definition—"a sexual act for which something of value is given or received"—could encompass

a range of legal sexually oriented services, such as phone sex services and pay-for-view

websites. (Doc. No. 4 at 28–29.) Defendants argue first that the statute "does not implicate First

Amendment scrutiny because it criminalizes only offers to engage in illegal transactions." (Doc.

No. 20 at 29.) Even if First Amendment rights are implicated, they contend that, while the term

"commercial sex act" "may not be clear in every application," it is "almost identical" to the

36

definition contained in the federal sex trafficking law, which has been upheld by two district courts in Florida and Connecticut.  (Doc. No. 20 at 30.)

A criminal statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010). That is, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

Arising under the Due Process Clause of the Fifth and Fourteenth Amendments, the vagueness doctrine has two primary goals: to provide fair warning of proscribed criminal conduct, and to provide explicit standards to prevent arbitrary and discriminatory enforcement of the law. *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see Grayned*, 408 U.S. at 108–09.  A third, "special concern" arises when a "vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,'" *Grayned*, 408 U.S. at 109 (citation omitted), "because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997).  The potential for "speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images" is heightened with criminal statutes because criminal convictions carry social stigma and the risk of imprisonment." *Id.* at 872.  As a result, "[a] statute that fails to constrain 'an official's decision to limit speech' with 'objective criteria' is unconstitutionally vague." *Miller*, 622 F.3d at 539 (citation omitted).

Here, the Court finds that Plaintiff is likely to succeed in establishing the law is unconstitutionally vague.  As a preliminary matter, the statute does trigger First Amendment concerns for vagueness.  Despite Defendants' assertions to the contrary, the statute as written does not "criminalize only offers to engage in illegal transactions" because—as discussed

37

above—the statute's potential reach extends to notices related to legal, consensual activity by adults.

Next, as Backpage.com argues, the Court finds the term "commercial sex act" is likely too vague to provide fair warning to potential violators or to ensure non-discriminatory enforcement. The statute defines a "commercial sex act" simply as "a sexual act for which something of value is given or received." Tenn. Code Ann. § 39-13-301. It does not further define the terms "sexual act" or "something of value." Backpage.com puts forth numerous legal activities unrelated to child sex trafficking that could comprise a "sexual act," from "phone sex services, nude dancing, online chat services, [and] adult pay-for-view websites [to] other legal sexually oriented material." (Doc. No. 4 at 29.) Parties, it claims, would be left "to guess whether [these] . . . are 'sexual acts' within the meaning of the Act." (Doc. No. 31 at 35.) Defendants do not dispute the breadth of possible interpretations of what constitutes a "sexual act," apart from quoting a sweeping statement from *United States v. Williams* that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." 553 U.S. at 304. (Doc. No. 20 at 29.)

Perfect clarity may not be a prerequisite to constitutionality, but the statute at issue is likely far off the mark. The Court finds the amorphous term "sexual act" lacks any objective criteria whatsoever that would define its parameters within the context of child sex trafficking. As a way of comparison, Backpage.com highlights the specificity with which the state's child sexual exploitation law defines "sexual activity":

> (A) Vaginal, anal or oral intercourse, whether done with another person or an animal; (B) Masturbation, whether done alone or with another human or an animal; (C) Patently offensive, as determined by contemporary community standards, physical contact with or touching of a person's clothed or unclothed genitals, pubic area, buttocks or breasts in an act of apparent sexual stimulation or sexual abuse; (D) Sadomasochistic abuse, including flagellation, torture, physical

38

restraint, domination or subordination by or upon a person for the purpose of sexual gratification of any person; (E) The insertion of any part of a person's body or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure by a licensed professional; (F) Patently offensive, as determined by contemporary community standards, conduct, representations, depictions or descriptions of excretory functions; or (G) Lascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person.

Tenn. Code Ann. § 39-17-1002(8) (West 2012). In fact, the same section of the Tennessee code that fails to elaborate on the meaning of a "sexual act" under the advertising offense defines "sexually explicit conduct" (relating to a different offense) as "actual or simulated"

(A) Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (B) Bestiality; (C) Masturbation; (D) Lewd exhibition of the genitals or pubic area of any person; (E) Flagellation or torture by or upon a person who is nude; (F) Condition of being fettered, bound or otherwise physically restrained on the part of a person who is nude; (G) Physical contact in an act of apparent sexual stimulation or gratification with any person's unclothed genitals, pubic area or buttocks or with a female's nude breasts; (H) Defecation or urination for the purpose of sexual stimulation of the viewer; or (I) Penetration of the vagina or rectum by any object except when done as part of a recognized medical procedure.

Tenn. Code Ann. § 39-13-301(11) (West 2012). The contrast in detail between these definitions is stark: the legislature has parsed and categorized "sexually explicit conduct" to include specific acts, from oral-anal sexual intercourse to bondage and defecation, but it leaves the contents of a "sexual act" entirely to the imagination. As a result, the Court finds the state law at issue here will likely lead to chilling of speech by those uncertain of what "sexual act" means, and to arbitrary and discretionary enforcement by officials who are left to define the term on their own.

In addition, the Court finds the undefined term "something of value" likely suffers from the same infirmity. As noted above, a sexual act given in exchange for "something of value" could include anything from a bottle of wine to cooking a meal. *See McKenna*, 2012

39

WL3064543 at *16. The interpretation of what constitutes "something of value" is perhaps even more susceptible to arbitrary treatment than "sexual act," as one man's junk may be another's treasure.

In defense of the "something of value" language, Defendants argue that it mirrors the federal child sex trafficking statute, 18 U.S.C. § 1591(e)(3) (2012) (defining a "commercial sex act" as "any sex act, on account of which anything of value is given or received"), which has been upheld twice by other district courts. (Doc. No. 20 at 30.) However, there is a critical difference between the federal and state laws: the federal offense does not touch on First Amendment freedoms, as it does not regulate expression and advertisements potentially unrelated to sex trafficking, but is limited to actual acts to recruit, entice, transport, and harbor victims of sex trafficking or otherwise participate in sex trafficking. 18 U.S.C. § 1591(a). In *United States v. Paris*, one of two cases highlighted by Defendants, the district court noted that "'[i]n the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not on the ground that the statute may conceivably be applied unconstitutionally to others in situations not before the Court.'" No. 3:06-CR-64, 2007 WL 3124724 at *13 (D. Conn. Oct. 24, 2007) (quoting *United States v. Coonan*, 938 F.2d 1553, 1561–62 (2d Cir. 1991)). The court, thus, limited the persuasiveness of its holding to a case removed from the First Amendment and "involv[ing] overwhelming evidence of sexual intercourse," which the court held fell "within the heartland of the term 'sex act,'" such that "Section 1591 provided fair warning that it applied to such conduct." *Id.* That case is not before this Court, and here the Tennessee law is judged against the First Amendment.

Lastly, other undefined terms in the statute also raise a possible issue of vagueness. For instance, the Court finds the term "offer" is likely unconstitutionally vague because the statute fails to provide any criteria for law enforcement to determine when an offer to sell an

advertisement has been made. The Court finds this particularly problematic in the Internet advertising realm because, as Backpage.com stated at the August 2012 hearing, online classified advertisement services do not "sell" pre-screened advertisements, but make space available for third parties to post their own content. (Doc. No. 37 at 10.) Would an "offer" in this context include an open invitation by a publisher for third parties to submit paid content, even if the publisher ultimately refuses to publish the message? Based on Defendants' oft-repeated position that section 39-13-314 punishes only the sale and not the publication of the advertisement (Doc. Nos. 20 at 4; 37 at 31; 39 at 2), the Court finds the answer to this question remains unclear.

For these reasons, the Court finds section 39-13-314 is likely unconstitutionally vague and invalid on its face.

### d. Content-Based Restriction

Backpage.com also argues that the state law violates the First Amendment because it amounts to a content-based restriction that fails strict scrutiny analysis. (Doc. No. 4 at 22–24.) Backpage.com contends that less restrictive alternatives exist to meet the state's goals, and that the current law is underinclusive. (Doc. No. 4 at 23–24.) Defendants, however, maintain that the law regulates only commercial speech that proposes illegal activity and is, therefore, unprotected by the First Amendment. (Doc. No. 20 at 24–25.) In the alternative, they argue, the law passes constitutional muster as a regulation on legal commercial speech. (Doc. No. 20 at 25.)

"The most basic of [First Amendment] principles is this: '[A]s a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (citing *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) ("*Ashcroft v. ACLU*")). As a result, content-based restrictions on speech receive the highest scrutiny by the courts, and "[i]t is

41

rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).

A restriction on speech is content-based if it is not "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). In other words, a content-based restriction "focuses *only* on the content of the speech and the direct impact that speech has on its listeners," *Boos v. Barry*, 485 U.S. 312, 321 (1988), or is "designed or intended to suppress or restrict the expression of specific speakers," *Playboy*, 529 U.S. at 812.

Here, the Court finds the statute at issue here is a clear-cut example of a content-based restriction on speech, as it imposes liability for advertisements solely on the basis that they contain certain proscribed content: what appears to be the promotion of a sexual act with minors for something of value. The regulation does not apply to advertisements that appear to promote the sale of non-sexual acts, such as used car sales or hairdressing services. In addition, the Court finds that the law appears to "single out" particular speakers for regulation, as it punishes publishers who sell these notices or advertisements, but not those who host the same advertisements for free. (Doc. No. 21 at ¶ 18); *see Playboy*, 529 U.S. at 812 (federal decency law restricted one television channel's "market as a penalty for its programming choice, though other channels capable of transmitting like material are altogether exempt").

If a statute regulates speech based on its content, the regulation must meet strict scrutiny, such that it is narrowly tailored to promote a compelling government interest. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). In addition, content-based restrictions "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. at 660. As a result, such a restriction is

42

"presumed invalid," and the Government bears the burden of showing its constitutionality. *Id.* at 660 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992); *Playboy*, 529 U.S. at 817).

Here, Backpage.com does not dispute that the state has a compelling interest in protecting the health and well-being of minors in the state, specifically in combating child sex trafficking and reducing the sexual exploitation of children. (Doc. 4 at 22–24); *see Sable Commc'ns of Cal.*, 492 U.S. at 126 ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."). The issue in dispute is whether, under the statute, "speech is restricted no further than necessary to achieve the goal" so "that legitimate speech is not chilled or punished." *Ashcroft v. ACLU*, 542 U.S. at 666.

To meet its burden, "[t]he State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown*, 131 S. Ct. at 2738 (internal citations omitted). Specifically, "the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. at 666. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. "The Government's burden is not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective." *Ashcroft v. ACLU*, 542 U.S. at 669 (citing *Reno*, 521 U.S. at 874).

Here, the Court finds Defendants will likely fail to meet this burden, as they have failed to show the statute is the least speech-restrictive solution to combat child sex trafficking in Tennessee. The Court finds Backpage.com has proposed several available, alternative measures that Defendants have not shown are less effective to meeting its goal. These include enacting criminal penalties against the pimps who knowingly post online ads for child sex trafficking, which Connecticut enacted after rejecting a bill similar to Tennessee's. (Doc. Nos. 4 at 23; 4-2

43

at Ex. W); *see Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.") Backpage.com also proposes the state work with businesses to collaborate on ways to use technology and the Internet to combat sex trafficking, a step California has recently taken. (*Id.*; Doc. No. 4-2 ¶ 24, Ex. X.) The Court finds Defendants have failed to address these alternatives, much less have they shown that the state's current solution has any effect on reducing sex trafficking, as discussed below. *See Ashcroft v. ACLU*, 542 U.S. at 668–69.

In addition, Backpage.com convincingly argues that the statute is sufficiently underinclusive to meet constitutional muster, a point Defendants will likely fail to defeat. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 131 S. Ct. at 2740 (citations omitted). If a "regulation is wildly underinclusive when judged against its asserted justification," this may be "alone enough to defeat it." *Id.* (holding a California restriction on the sale of violent video games to minors was insufficiently tailored and underinclusive to address the effects of violence on children because it "singled out the purveyors of video games for disfavored treatment" compared to other media.) Here, this Court finds the statute is likely underinclusive because it restricts lawful speech in an effort to address only one narrow aspect of child sex trafficking and, in doing so, singles out purveyors of paid advertisement space only, while leaving providers of free advertisements to escape liability even for ads patently advertising child prostitution. This creates rife opportunity for a migration of advertisements to free outlets, as evidence shows has occurred in the past. (Doc. No. 4-2 at Ex. E, S, T, U, V). As Backpage.com argues, this "materially undermines the State's ostensible purpose, because requiring credit card payment for adult-oriented ads . . . discourages abusive posts" and helps "track users engaged in illegal activity." (Doc. No. 4 at 24.) While

44

Backpage.com makes additional and convincing arguments about the law's unequal treatment of advertisers based on age-verification standards, the Court finds the paid/free distinction alone amounts to evidence of significant underinclusiveness that makes the statute likely impossible to justify under the First Amendment.

Again, Defendants do not respond directly to Backpage.com's argument about the free/paid distinction, instead focusing on its secondary arguments and arguing generally about underinclusiveness based on the Sixth Circuit's decision in *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997). (Doc. No. 20 at 26–27.) Defendants cite *DLS* for the perplexing proposition that a statute cannot be unconstitutionally underinclusive "where the content of the differently regulated speech [under the law] is 'virtually identical'" to other speech not regulated by the law. (Doc. No. 20 at 27.) Defendants' reliance on *DLS* is misleading and misplaced. *DLS* dealt with a restriction on expressive activity—a municipal ordinance restricting nude dancing—and not pure speech, such that a less stringent standard than strict scrutiny applied. *DLS*, 107 F.3d at 408–13 (applying the *O'Brien* test). The *DLS* court did not conclude the municipal ordinance was not underinclusive *simply because* the city regulated the "virtually identical" content differently; rather, the court clearly stated that the mode for the expression (nude dancing) posed greater dangers than other means of expressing the same sexual content (e.g., books with nudity). *Id.* at 411–12. Because the regulated activity was more "dangerous" and because the activity itself was the target of the regulation, it did not suggest underinclusiveness that the same sexually explicit content was regulated differently when occurring in different activities. *Id.*

Here, because the statute deals with a restriction on pure speech and not a regulation of expressive activity, *DLS*'s reasoning is irrelevant. Even if it did have some relevance, the Court finds there is no obvious, material difference in the mode of expression between paid and free

45

advertisements: an advertisement is the same in content and its delivery of the content, whether the speaker paid for it or not. This is especially true for websites such as Backpage.com, where some categories of advertisements are paid and some unpaid without any appreciable distinction on the face of the advertisement itself.

Thus, for the reasons above, the Court finds section 39-13-314 is likely a content-based restriction that fails to meet strict scrutiny and is thus facially invalid.

e. Commercial Speech

Defendants insist that the state law is a restriction of commercial speech only, and thus is subject to a less stringent standard than content-based restrictions. (Doc. No. 20 at 22–26.) Although this Court has concluded that section 39-13-314 regulates both commercial and noncommercial speech—and therefore a content-based standard should apply—the Court finds that even under a commercial speech standard Defendants would not meet their burden to establish the law is adequately tailored to achieve its ends.

A four-part analysis determines whether commercial speech is protected by the First Amendment: first, the speech must concern lawful activity and not be misleading; second, the asserted governmental interest must be substantial; third, the regulation must directly advance the asserted governmental interest; and, fourth, it must not be more extensive than is necessary to serve that interest. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566. As discussed at several points above, the Court finds section 39-13-314 reaches lawful activities alongside unlawful activities, such as prostitution, and that Defendants have asserted a substantial government interest in protecting minors by preventing sex trafficking. The analysis here focuses on the final two prongs of the *Central Hudson* test.

A court must determine "whether the challenged regulation advances [the government's] interests in a *direct and material* way, and whether the extent of the restriction on protected

46

speech is in reasonable proportion to the interests served." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (emphasis added). The state bears the burden of proving the constitutionality of its regulation. *Id.* at 770. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770–71.

In addition, the Supreme Court has recognized that "special concerns arise from 'regulations that entirely suppress commercial speech in order to pursue a non[-]speech-related policy.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 500 (1996) (quoting *Cent. Hudson*, 447 U.S. at 566 n.9). In such a case, a court "must review the [restriction] with 'special care,' mindful that speech prohibitions of this type rarely survive constitutional review." *Id.* at 504 (quoting *Cent. Hudson*, 447 U.S. at 566 n.9).

Here, the Court finds the Defendants are not likely to establish that the restrictions on advertisements would alleviate the evil of sex trafficking to a material degree. In fact, Defendants have shown no evidence that criminalizing the sale of certain advertisements would have any effect on child sex trafficking in Tennessee. Rather, they simply argue that this effect is common sense because criminalizing advertisements under section 39-13-314 reduces the economic incentives to publish the advertisements, thus "likely reduc[ing] the number of them and correspondingly reduc[ing] the number of minors trafficked for commercial sex acts." (Doc. No. 20 at 26.) The regulation's effect to reduce sex trafficking might appear commonsensical to Defendants, however, Backpage.com has shown evidence to the contrary. Backpage.com has offered reports showing that when craigslist shuttered its paid-for adult services section in 2010, advertisements for paid sex services simply migrated elsewhere—primarily to Backpage.com, Facebook and craigslist's free advertisements. (Doc. No. 4-2 at Ex. D, E, S, T, U, V.) The Court

47

finds the migration to non-paying advertisements could effectively run the illegal activity more underground, as it removes a means of tracking information about the culprits and victims of sex trafficking, and thus might actually undermine the state's interests. (Doc. Nos. 4 at 24; 4-3 ¶ 6.)

In addition, while Defendants rely on the 2011 study commissioned by the state legislature to establish that a "serious problem" of sex trafficking exists in Tennessee, they grossly misrepresent the study's conclusions, seemly claiming that it "recognized . . . that paid advertising plays a significant role in promoting and facilitating that trade." (Doc. No. 20 at 3.) Having reviewed the study (Doc. No. 21 at Ex. 5), the Court finds it made no such conclusion regarding online advertising, as it discusses online escort advertisements only once, in passing, in a case study detailing one woman's story. (*Id.* at Ex. 5 p.45.) Defendants have also glossed over the fact that, among the study's numerous, concrete suggestions for legal measures to combat sex trafficking, there is no recommendation for the legislature to restrict any advertisements. (*Id.* at Ex. 5 pp.3, 30–31, 34, 37–38, 48–50.) Instead, the study's focus groups recommended "compassionate custody, safe haven laws, enhanced asset forfeiture for pimps and Johns, enhanced penalties for sex trafficking within restricted areas, graduated offender sentencing," a sex offender registry for persons convicted of sex trafficking, and victim restitution. (*Id.* at Ex. 5 p.49.)

Finally, the Court finds Defendants likely cannot satisfy the requirement that the state's restriction on speech "not be more extensive than is necessary to serve [its] interest." *Cent. Hudson*, 447 U.S. at 566. Defendants simply assert the conclusion that reducing the number of advertisements is reasonable and the "statute reaches no further than necessary" without offering supporting evidence. (Doc. No. 20 at 26.) While the standard for commercial speech may not be "the least restrictive" analysis of content-based restrictions on speech discussed above, the Court finds section 39-13-314 fails here for the same reasons stated above. Ultimately, Defendants

48

have not shown why the law is necessary when other regulations or acts that do not restrict lawful speech—such as imposing liability on those who post advertisements for sex acts with minors, or the myriad laws suggested in the 2011 study—would likely be more effective at stopping the sex trafficking of minors. *See 44 Liquormart*, 517 U.S. at 507 ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal.")

Thus, the Court finds that, even under a lower commercial speech standard, section 39-13-314 likely violates the First Amendment and is facially invalid.

iii. Commerce Clause

Backpage.com also argues the state law violates the Commerce Clause of the U.S. Constitution because it impermissibly controls commerce that occurs outside of Tennessee. (Doc. No. 4 at 29–31.) In the alternative, Backpage.com argues the statute violates the Commerce Clause because its burden on interstate commerce outweighs its minimal benefits to the state. (Doc. No. 31 at 30–31.)

A state regulation may be a per se violation the Dormant Commerce Clause if it directly controls extraterritorial conduct. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 645 (6th Cir. 2010) (citation omitted). This is because "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "Most critical to this inquiry is the issue of 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Int'l Dairy Foods*, 622 F.3d at 645 (quoting *Healy*, 491 U.S. at 337)). Circuits outside the Sixth Circuit have recognized that, "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities

without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342

F.3d 96, 103 (2d Cir. 2003) (quoting *Healy*, 491 U.S. at 334).

When a state regulation is neither extraterritorial nor discriminates against out-of-state

actors, it may still violate the Commerce Clause if its burden on interstate commerce is "clearly

excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137,

142 (1970) (citation omitted). Under this balancing test,

> [i]f a legitimate local purpose is found, then the question becomes one
> of degree. And the extent of the burden that will be tolerated will of
> course depend on the nature of the local interest involved, and on
> whether it could be promoted as well with a lesser impact on interstate
> activities.

*Id.*

Here, the Court finds Backpage.com is likely to succeed on its Commerce Clause claim.

First, the Court finds the statute is a per se violation because it likely impermissibly regulates

commerce wholly outside the state's borders. Nowhere in the language of the statute is there any

limit on the statute's geographic scope that specifies what conduct, if any, must take place in

Tennessee. This is the case whether an advertisement appears online or in print. As discussed

above, the plain language of the text of section 39-13-314 requires only that a person know that

the advertisement he sells (or offers to sell) would appear to promote a commercial sex act with a

minor. It does not limit where either possible transaction—the sale or offer to sell, or the

potential sex act advertised—would "occur."

By comparison, the statute at issue in *McKenna* explicitly stated—twice—that its scope

was limited to the publication of advertisements of acts "to occur" and "to take place in the state

of Washington." *McKenna*, 2012 WL 304543 at *4. Even then, the *McKenna* court found the

statute violated the Commerce Clause because it could regulate advertisements of out-of-state

publications. *Id.* at *21. The same analysis applies here. As with the Washington law, the

50

Tennessee law could impose liability for an online advertisement that appears to promote a sex act with a minor in Tennessee (or the offer to publish the advertisement), if no sale or publication took place in Tennessee. But it is also potentially broader. Defendants concede it might apply if the buyer of the advertisement were based in Tennessee, but if the advertisement itself and the child sexual services promoted appeared to take place in another state. (Doc. No. 20 at 7.) Based on the law's text, liability could be imposed when no party has a connection to Tennessee whatsoever.

While Defendants concede "there is nothing in the text of [the law] that geographically limits its application" (Doc. No. 20 at 6), they propose a narrowing construction of the statute. They argue the statute should be read in *pari materia* with the overall jurisdictional provision of the state criminal codes, Tenn. Code Ann. § 39-11-103, which states that any person who commits or consummates an offense in the state may be held liable under Tennessee law. (Doc. No. 20 at 6.) With this provision in mind, Defendants contend, the legislature "did not intend to subject anyone to prosecution unless there was sufficient connection between the criminal conduct and the State of Tennessee." (Doc. No. 20 at 7.) Defendants then assert that a website "could arguably be subject to prosecution" if it sells advertisements for commercial sex acts with minors that were "directed to Tennessee residents and the unlawful sexual contact was going to take place in Tennessee." (Doc. No. 20 at 6–7.)

The Court finds that reading the statute in *pari materia* with Tenn. Code Ann. § 39-11-103 does not create sufficiently concrete geographic limitations on section 39-13-314's scope, especially given territorial issues unique to sex trafficking and the Internet. Section 39-11-103 states only that a person may be liable "for an offense committed in this state," "[w]hen an offense is commenced outside of this state and consummated in this state," or when "an offense commenced within this state is consummated outside of its boundaries." Tenn. Code Ann. § 39-

51

11-103(a), (b)(1), (c) (West 2012).  As Backpage.com argues, this provision "*permits* but does not *preclude* application of Tennessee criminal laws to out-of-state residents."  (Doc. No. 31 at 38.)  As a result, the Court finds this provision alone does not create boundaries here because section 39-13-314 itself does not define where or at what point the offense of offering to sell or selling an advertisement for a commercial sex act is "committed," "consummated," or "commenced," a determination that becomes complicated when dealing with interstate actors and a nationwide platform.

Defendants provide no further statutory support and absolutely no legislative history to support their narrow reading that the state legislature intended the statute to apply only to ads targeting or involving Tennessee residents.  The Court finds the legislature did not hold public hearings on the bill or engage in substantive debate of its merits (Doc. Nos. 4 at 13; 31 at 12), and Defendants have not shown any actual evidence of the legislature's intent to limit its territorial reach.  The only legislative discussion Defendants point to in the totality of their briefing is an exchange between a state senator and the bill's author in a committee meeting, when the senator asked, "how does this amendment affect, for example, a newspaper[] that were running an ad?"  (Doc. Nos. 4-2 at Ex. N; 39 at 4.)  The Court finds this vague question was untethered from any geographic bounds and therefore does not support Defendants' sweeping conclusion that the legislature "*clearly* meant [the statute] to apply to *local* print media such as newspapers and magazines."  (Doc. No. 20 at 31) (emphasis added).

In fact, Defendants' own argument—based on reading related statutes in *pari materia*— leads to the opposite conclusion from their own: that the state legislature knew of the inherent slipperiness of territoriality and jurisdiction when it comes to sex trafficking, and chose not to include a territorial limit.  Unlike the statute at issue here, the state's codification of other criminal child exploitation offenses contains explicit clauses clarifying the offenses' territorial

52

coverage.  For instance, solicitation of a minor and solicitation of a minor "to observe sexual conduct" both include the following limitation:

> A person is subject to prosecution in this state under this section for any conduct that originates in this state, or for any conduct that originates by a person located outside this state, where the person solicited the conduct of a minor located in this state, or solicited a law enforcement officer posing as a minor located within this state.

Tenn. Code Ann. § 39-13-528(d) (West 2012); § 39-13-529(d) (West 2012).  Similarly, the offense of "especially aggravated sexual exploitation" states that

> [a] person is subject to prosecution in this state under this section for any conduct that originates in this state, or for any conduct that originates by a person located outside this state, where the person promoted, employed, assisted, transported or permitted a minor to engage in the performance of, or production of, acts or material within this state.

Tenn. Code Ann. § 39-17-1005(f) (West 2012).  *See also* Tenn. Code Ann. § 39-17-1004(d) (near-identical language applying to "aggravated sexual exploitation").  Here, the Court finds the legislature's silence as to any such territorial requirement in its drafting of section 39-13-314 likely indicates its intention for the statute to have extraterritorial reach to the same or greater degree than the Washington law in *McKenna*.

In addition, this Court is particularly reluctant to adopt Defendants' reading based on the record Defendants themselves have presented.  In exhibits to demonstrate the prevalence of child sex ads on Backpage.com, Defendants have shared TBI files on two allegedly underage girls whom they state were victims of sex trafficking advertised on Backpage.com in 2010 and 2011.  (Doc. Nos. 21-1; 21-2.)  For one girl, there is no Tennessee connection apparent on the face of any of eight advertisements included in her file[7]: the ads were posted in the escort services portal specific to Atlanta, Georgia; they contain no visible Tennessee phone number or contact

---

[7] The TBI, nonetheless, labeled the clip of advertisements "Tennessee Backpage.com Ads."  (Doc. No. 21-2 at 1.) In addition, the other girl's file contains an advertisement posted in the adult section of Backpage.com's Little Rock, Arkansas, portal.  (Doc. No. 21-1 at 11–13.)

information; and they state nothing in the text to suggest that the advertisement related to services offered in Tennessee. (Doc. No. 21-2.) Rather, the ads specifically say the "escort" was located in Atlanta or Jonesboro, Georgia. (*Id.*) Even under Defendants' narrowed reading of the statute's territoriality, nothing in these ads signaled they involved a Tennessee resident or were "directed to Tennessee," unless one interprets this standard so broadly as to include advertisements directed to cities and communities two hours from the Tennessee-Georgia border. The Court finds the fact that the majority of Defendants' evidence of child sex ads on Backpage.com does not have any facial connection to Tennessee severely undermines the sincerity of their retroactive attempt to insert territorial limits into the law.

The Court makes these findings recognizing the inherent challenge in crafting a local regulation of Internet advertising, which Defendants concede falls within the statute's scope (Doc. No. 20 at 7). In examining state regulations of indecent material made available online to minors, circuits outside the Sixth Circuit have made clear that, "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (citing *Healy* at 334); *see PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) ("Given the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material . . . can be construed to have only local effect.") While Defendants distinguish these Internet-related cases based on the offenses they regulate (Doc. No. 20 at 34), the message from these cases is that a legislature must make the narrow geographic scope of its laws explicit to stay within the confines of the Dormant Commerce Clause when regulating Internet activity. *See Dean*, 342 F.3d at 103. Otherwise, even if a court must attempt to uphold a law based on every reasonable construction, it will not completely rewrite the law's terms so that the law complies with the Constitution. *See Reno*, 521 U.S. at 884–85. Thus, this

54

Court finds Defendants' narrowing reading of section 39-13-314 unreasonable in light of the statutory language, legislative history, and the record.

Second, even if the statute were read to have limited extraterritorial reach, the Court finds the burden it would place on interstate commerce "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Defendants have stated that the state has an interest in "protecting minors" by "eliminating the sex trafficking of children in the State" (Doc. No. 20 at 33), which the Court finds is a legitimate interest and an important duty of the state. However, the Court finds Backpage.com is likely to prevail on its argument that the burden on interstate commerce clearly exceeds any possible benefit from the law. As discussed above, the Court finds the statute regulates a far-reaching range of print and online advertisements, from personal ads to text-only hyperlink advertisements that commonly appear on webpages. (Doc. No. 37 at 14.) Under Defendants' formulation of the law, any paid advertisement potentially involving a sex act with a minor sold in any state or online that was "directed to" Tennessee residents could create liability—unless the seller personally verified the government-issued identity documents of any potential minor in the advertisement. As the *McKenna* court determined, this likely poses a serious burden on interstate commerce, *McKenna*, 2012 WL 304543 at *21; a conclusion given even more weight here, considering Tennessee is one of only two states in the nation that border eight other states,[8] and several metropolitan areas in those states lie within 200 miles of the Tennessee border. In addition, as discussed regarding overbreadth above, Backpage.com has shown evidence to undermine what benefits, if any, the state would receive from the statute because: the law does not apply to free advertisements; past evidence shows that such advertisements would likely migrate to free websites; free advertisements undermine the tracking

---

[8] Tennessee borders Alabama, Arkansas, Georgia, Kentucky, Mississippi, Missouri, North Carolina, and Virginia.

of sex traffickers because they do not collect credit card information; and the statute does not penalize the people who post the advertisements or who solicit the sex acts the ads sell.

Thus, for the reasons above, the Court finds Backpage.com has shown sufficient evidence of the statute's extraterritoriality and excessive burdens, such that it is likely to prevail on its Commerce Clause claim.

### B. Irreparable Injury, Balance of Equities, and Public Interest

While Backpage.com's likelihood of success on the merits is the primary factor supporting a preliminary injunction, *Nightclubs*, 202 F.3d at 888, the Court finds that the remaining three factors for a preliminary injunction also favor issuing the relief.

It is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted); *see Bays*, 668 F.3d at 825. As for the balance of equities, the Sixth Circuit has stated that "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment." *Deja Vu of Nashville*, 274 F.3d at 400 (citation omitted). Similarly, for the final public interest factor, the Sixth Circuit has held that "it is always in the public interest to prevent violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citation omitted); *see Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991) (for purposes of injunctions involving free speech principles, "the public interest lies in a correct application" of the First Amendment).

As detailed above, this Court finds Backpage.com likely to prevail on its claims that section 39-13-314 violates the First Amendment and the Commerce Clause, and is preempted by the CDA. Without an injunction of the statute's enforcement, the Court finds that print and online media across the country could face the choice Backpage.com has described between

56

foregoing the right to publish third-party content and risking felony charges. (Doc. No. 4 at 31.) While this violation of their constitutional rights would cause irreparable injury, the Court finds there is no evidence that the exercise of their rights would cause substantial harm. In addition, it is in the public interest to uphold their constitutional rights. Thus, the Court finds the four factors for the issuance of a preliminary injunction are satisfied in this case.

V.    CONCLUSION

For the reasons stated above, Plaintiff's Motion is **GRANTED**. Defendants shall be enjoined from enforcing the terms of Tenn. Code Ann. § 39-13-314.

It is so ORDERED.

Entered this _____3rd_____ day of January, 2013.


_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT